**AMERICAN ROCK SALT COMPANY, LLC, Plaintiff,**

v.

**NORFOLK SOUTHERN CORPORATION, Norfolk Southern Railway Company, Defendants.**

No. 00–CV–6534L(F).

United States District Court, W.D. New York.

Aug. 19, 2004.

Order denying reconsideration March 18, 2005.

---

Harris Beach, LLP, Laura Smalley, of Counsel, Pittsford, NY, for the Plaintiff.

Janssen & Keenan, P.C., Paul D. Keenan, of Counsel, Philadelphia, PA, for the Defendants.

## AMENDED DECISION and ORDER

FOSCHIO, United States Magistrate Judge.

### JURISDICTION

This matter was referred to the undersigned by Hon. David G. Larimer on October 24, 2002 for pretrial matters pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). It is presently before the court on Plaintiff's motion to compel filed December 23, 2002 (Doc. No. 37).

### BACKGROUND

Plaintiff filed the instant motion on December 23, 2002 (Doc. No. 37) along with the Affirmation of Paul J. Yesawich, III, Esq., in Support of Plaintiff's Motion to Compel dated December 23, 2002 (Doc. No. 38) ("Yesa-

wich Affirmation") attaching Exhibits A—P ("Plaintiff's Exhibit(s) ___"). Also filed was Plaintiff's Memorandum of Law In Support of its Motion to Compel Discovery Responses (Doc. No. 39) ("Plaintiff's Memorandum") together with a Local Rule 37 Certification (Doc. No. 40) ("Plaintiff's Rule 37 Certification").

On January 24, 2003, Defendants filed a Memorandum of Law in Opposition to Plaintiff's Motion to Compel (Doc. No. 42) ("Defendants' Memorandum") attaching Exhibits A—D ("Defendants' Exhibit(s) ___").

Oral argument was conducted on February 5, 2003. Decision was reserved.

## FACTS [1]

By its Amended Complaint, Plaintiff alleges causes of action for breach of a transportation contract entered into with Defendants on June 8, 1999 ("Plaintiff's First Cause of Action"), for violation of 49 U.S.C. § 11101(a) and 11121(a)(1) ("Plaintiff's Second Cause of Action"), and for violations of 49 C.F.R. Pt. 1035(b)(2) and 49 U.S.C. § 11706 ("Plaintiff's Third Cause of Action"). Plaintiff asserts that Defendants violated the transportation contract and these provisions by failing to ship its commercial rock salt "with reasonable dispatch." 49 C.F.R. Pt. 1035 Appendix B, Sec. 2(a).

Plaintiff is a producer and shipper of commercial deicing rock salt mined in Mount Morris, New York. During 1999—2000, Plaintiff was also resold salt produced by other companies. In particular, Plaintiff acquired the option to purchase deicing salt from Cargill, Inc. as a result of an antitrust consent decree approving Cargill's acquisition of a competitor salt mining company, Akso–Nobel, N.V. ("Akso–Nobel") located in the same region of New York state as Plaintiff.

Prior to June 1, 1999, Plaintiff had a transportation contract with Conrail, a major railroad company serving the Western New York, Northeastern Ohio and Western Pennsylvania regions, for shipment of its salt products from locations in Western New York and Northern Ohio to customers located within Ohio and Pennsylvania. Plaintiff asserts that commercial salt from Cargill salt mines in South Lansing, New York and Cleveland, Ohio was previously shipped by Cargill over Conrail routes identical to those over which Plaintiff's salt had been shipped under Plaintiff's prior transportation contract with Conrail ("the Defined Routes") or similar routes, over which Defendants acquired control as of June 1, 1999. Yesawich Affirmation ¶ 5. Defendants acquired, on May 23, 1997, a controlling interest in Conrail with whom Plaintiff had a prior transportation contract for shipment of Plaintiff's rock salt from Plaintiff's mines in New York state to points in Ohio and Western Pennsylvania. Defendants began operation of the Defined Routes on June 1, 1999. Plaintiff claims that contrary to assurances made to it by Defendants as an inducement to enter into the transportation contracts with Defendants, Complaint ¶ ¶ 19–20, significant delays in Defendants' rail service provided to Plaintiff under the transportation contract for rail shipments of salt purchased by Plaintiff from the Cargill mines, using the Defined Routes, resulted in extra transportation costs and economic losses to Plaintiff. Complaint ¶ ¶ 23–24. According to Plaintiff, the delays in delivery of Plaintiff's salt caused by Defendants violated Defendants' legal obligation as a rail common carrier to ship a customer's product with "reasonable dispatch," as required by 49 C.F.R.App. B. Pt. 1035 sec. 2(a). Complaint ¶ 36.

At issue on Plaintiff's motion are Defendants' objections to Plaintiff's Third Request for Documents, dated August 13, 2002, Plaintiff's Exhibit C, Nos. 1–9 ("Plaintiff's Request(s)") and Plaintiff's Second Set of Interrogatories dated May 29, 2002, Plaintiff's Exhibit D, Nos. 1(a)-(g) ("Plaintiff's Interrogatory No. 1"), Plaintiff's Memorandum at 7–16; 17. Specifically, Plaintiff's Requests ask Defendants to produce specific records and documents, for the period September 1, 1998 through September 1, 2000 ("the Designated Periods"), and with regard to seven railroad routes operated by Defendant ("the Defined Routes"), ostensibly those previously used by Conrail and, after June 1, 1999,

---

1. Taken from the pleadings and papers filed in    this action.

Defendants to ship Plaintiff's products between Cargill mines in New York state and Plaintiff's mines in Ohio to delivery points within Pennsylvania and Ohio. Plaintiff's Exhibit C at 4. Plaintiff's Interrogatory No. 1 requests Defendants to state the average turn time over the Defined Routes during the Designated Periods.

Specifically, Plaintiff's Request No. 1 seeks documents containing eight categories of information relating to the schedules for freight service, including plans, and reports to the Surface Transportation Board, and eight types to information and data relating to measurements of the actual rail freight shipping services provided by Defendants over the described Defendants' freight lines during the Designated Period ("the Request"). Plaintiff's Exhibit E at 2. Defendants objected to the Request as vague, overbroad, unduly burdensome, and on lack of relevancy grounds. Defendants' Responses to Plaintiff's Third Request for Production of Documents dated September 16, 2002, Plaintiff's Exhibit E at 2 ("Defendants' Response"). Defendants also state that they did not possess trip plans, service plans, blocking page books, train schedules, transportation service plans or car scheduling data responsive to the Request. *Id.* Defendants represented, however, that as to any of the requested train schedule documents created by Conrail that "may still exist," because Plaintiff's Request "... *do[es] not identify* what [train car] traffic moved in what blocks and from what locations, the requested documents" were not relevant, and requiring production would be unduly "burdensome." Defendants' Response at 2–3 (underlining added). Defendants also maintained that as any data in reports to the Surface Transportation Board and Conrail Transaction Counsel concerning Defendants' rail service for the Defined Routes, including "aggregated cycle time information" is not specific to particular routes or type of cargo, such as Plaintiff's commercial salt, Plaintiff's request is not relevant. *Id.* at 3; Defendants' Memorandum at 5.

Plaintiff's Request No. 2 requested Defendants provide the same documents described in Plaintiff's Request No. 1 for any docu-ments Defendants may have received from Conrail following Defendants acquisition of certain of Conrail's assets and routes, including the Defined Routes applicable to Plaintiff's shipments of its salt. For their response, Defendants incorporated their Response to Plaintiff's Request No. 1 stating that Conrail "did not make its data regarding service and transit time," for the Defined Routes, "available to defendants." Defendants' Response at 3.

Plaintiff's Request No. 3 sought production of all Defendants' reports, studies or analysis for rail "traffic" over the Defined Routes during the Designated Periods. Defendants responded by reiterating their objection in regard to Plaintiff's Request No. 1 and stated that they had produced documents relating to Plaintiff's service complaints. Defendants' Response at 3.

Plaintiff's Request No. 4 requires production of all Conrail records transferred to Defendants covering the same items of information requested from Defendant in Plaintiff's Document No. 3. Defendants, in response, interposed the same objections to Plaintiff's Request No. 3 and stated that Conrail did not provide the requested information to Defendants. Defendants' Response No. 4; Plaintiff's Exhibit E at 4.

Plaintiff's Request No. 5 requests records of all car movements owned, leased, pooled or assigned to Plaintiff, Cargill or Akso Nobel Salt used to transport product, particularly salt, over the Defined Routes and during the Designated Period. Plaintiff's Exhibit at 4. Defendants again objected on the grounds of vagueness, overbreadth, undue burdensomeness, and relevancy. *Id.* Defendants also stated that Conrail did not transfer service and transit time records to Defendants, and that without specific car numbers, Defendants were unable to obtain such records for Defendants' car movements in connection with the movement of Plaintiff's, Cargill's or Akso Nobel's salt shipments over Defendants' routes. *Id.*

Plaintiff's Request No. 6 requested the same car movement records described in Plaintiff's Request No. 5 for records transferred from Conrail to Defendants. Plaintiff's Exhibit E at 4. Defendants responded

with the same objections and representation that Conrail did not provide rail service and transit time information to Defendants. *Id.* at 4–5.

Plaintiff's Request No. 7 requests documents with information relating to "standards and goals," "planned transit times," "service standards," "trip plans," "car trip plans," "car scheduling plans" or rules, "train blocking plans," "service planning documents," or "car or train scheduling directives" for the Defined Routes and Designated Periods. Plaintiff's Exhibit E at 5. Defendants objected on the basis that Plaintiff's Request No. 7 was vague, overbroad, redundant (presumably referring to Plaintiff's Request No. 1), unduly burdensome, and lacking in relevance, and reasserted Defendants' response to Plaintiff's Request No. 1, *i.e.,* that Plaintiff's request lacked the reasonable specifics needed to enable Defendant to retrieve the responsive documents. *Id.* at 5.

Plaintiff's Request No. 8 seeks records of transportation contracts or agreements between Defendants, Conrail, Cargill and Akso Nobel for salt rail shipments over the Defined Routes. Plaintiff's Exhibit E at 5. Defendants objected on grounds of vagueness, overbreadth, undue burdensomeness, lack of relevancy and that the requested contracts are "confidential by their terms." *Id.*

Plaintiff's Request No. 9 requests minutes of meetings, agendas, notes, e-mails or reports for any meeting between Defendants, Conrail, Cargill or Akso Nobel relating to movement of products between trip origins and destinations over the Defined Routes. Plaintiff's Exhibit E at 5. Defendants objected on the same grounds as with Plaintiff's Request No. 8. *Id.* at 6.

Plaintiff's Second Set of Interrogatories No. 1(a)-(g) requested Defendants state the "average 'turn time' (defined as the time required for [Defendants'] to transport a rail car from one location to another) between" the seven routes listed in the Interrogatory, *e.g.,* "(a) South Lansing, New York and Cresson, Pennsylvania." Plaintiff's Exhibit D at 3. Defendants objected that the interrogatory was vague, meaningless, overbroad, and unduly burdensome. Plaintiff's Exhibit at 3.

However, Defendants also stated that no such "average turn time(s)" exist because the time required to haul a rail freight car from one point to another depends on a variety of factors, *e.g.,* the nature of the cargo, other traffic on the route, and weather, that Defendants do not "track 'average turn times,'" and, presumably referring to Plaintiff's Request No. 1, that where other "connecting carriers" and "short lines are involved," Defendants lack "access to the turn time" information as requested by Plaintiff. *Id.* at 3.

## DISCUSSION

■ In federal civil cases, pretrial discovery, including interrogatories pursuant to Fed.R.Civ.P. 33 and document requests pursuant to Rule 34, may be obtained for information relevant to any claim or defense. Fed.R.Civ.P. 26(b)(1); *See Land Ocean Logistics, Inc. v. Aqua Gulf Corp.,* 181 F.R.D. 229, 236 (W.D.N.Y.1998) (information is relevant provided it is reasonably calculated to lead to the discovery of admissible evidence); *Burns v. Imagine Films Entertainment, Inc.,* 164 F.R.D. 589, 591 (W.D.N.Y.1996) (citing *Daval Steel Prods. v. M/V Fakredine,* 951 F.2d 1357, 1367 (2d Cir.1991)). Moreover, generalized objections that discovery requests are vague, overly broad, or unduly burdensome are not acceptable, and will be overruled. *Athridge v. Aetna Casualty and Surety Co.,* 184 F.R.D. 181, 190–91 (D.D.C. 1998) (general boilerplate objections are ineffective); *Burns, supra,* at 593.

■ Plaintiff claims that an alleged breach by a railroad of its duty to deliver products "without undue delay" or "to transport with reasonable dispatch" is a recognized cause of action, and Defendants do not argue otherwise. *See New York, Philadelphia & Norfolk R.R. Co. v. Peninsula Produce Exch. of Maryland,* 240 U.S. 34, 38–39, 36 S.Ct. 230, 60 L.Ed. 511 (1916); *The Paper Magic Group v. J.B. Hunt Transport, Inc.,* 2001 WL 1003052, *2 (E.D.Pa. Aug.29, 2001); *United Trans. Sys. v. PIE Import Export,* 889 F.Supp. 94, 96–97 (S.D.N.Y.1995). Reasonableness, *i.e.,* reasonable dispatch, for this standard is "such time as is necessary conveniently to transport and make delivery of

shipment in the ordinary course of business, in the light of the circumstances and the conditions surrounding the transaction." *Chesapeake & O. Ry. Co. v. Martin*, 283 U.S. 209, 213, 51 S.Ct. 453, 75 L.Ed. 983 (1931); *The Paper Magic, supra; United Trans. Sys., supra.* The relevant circumstances to be considered on whether the "undue delay" requirement has been breached by a railroad common carrier, include the distance to be traveled, the time ordinarily required for like carriage, the character of the freight, the season of the year, and other factors. *Saul Sorkin*, GOODS IN TRANSIT, § 7.02[2] at 7–12, 7–25 (1996).

Turning first to Plaintiff's Interrogatory No. 1, as noted, Defendants do not object that the Interrogatory seeks irrelevant information, rather, Defendants' objection turns on whether Plaintiff requests that Defendant state the "*average* turn time (defined as the time required for [Defendants] to transport a rail car from one location to another between [the Defined Routes]" which include the "initial and return trips" between the place from which the rail car commenced the trip and its destination). Defendants' Memorandum at 3 (underlining added).

Specifically, Defendants' answer stated no such "average" turn times are available to Defendants, and generally turn times over rail routes vary depending on numerous factors including cargo, traffic on a specific route, car handling times, available "power [engines] and crew," and maintenance issues. Defendants' Memorandum at 3. Defendant also asserted that "turn times" involving routes service by "connecting carriers and/or short routes" are not accessible to Defendants, implying that "turn times" for the Defined Routes include such "connecting carrier and/or short routes." *Id.* Defendants further contend that "*most* of the specific information requested by plaintiff *in the discovery at issue* is simply *not maintained* by defendants." Defendants' Memorandum at 2. However, examples of car movement record relating to some of the places of shipment origination or destination at issue in this case, for example Cargill shipments of commercial salt between Cleveland, Ohio and Cresson, Pennsylvania and between Ludlow,

New York and Cresson, Pennsylvania are apparently maintained by Defendants. Plaintiff's Exhibit P. On close examination, Plaintiff's Exhibit P indicates an "out" time from Conep, PA and a corresponding "in" time fro Crene, PA for rail cars. Defendants do not dispute Plaintiff's description of Exhibit P nor offer a different explanation of the nature of the data is represents. Plaintiff also points to Defendant Norfolk Southern's 2001 Annual Report stating "transit times" within Defendant Norfolk Southern Rail's system had been reduced based in part on Defendants' study of "way bills." Plaintiff's Exhibit L at 6. That Defendants were able to achieve and measure such improvements in rail service, including "shipment velocity," *id.,* supports a finding that recorded data measuring "transit time" on Defendants' routes is available to Defendants.

Finally, at oral argument the court requested that Defendants supply an affidavit by a person with personal knowledge to support Defendants' objection of undue burdensomeness and that information responsive to Plaintiff's discovery requests were not in fact available to Defendant. Minute entry of proceedings, 00–CV–6534L(F) 2/05/03. In response, Defendants provided at oral argument a copy of an affidavit of Deborah Butler, Vice President of Customer Service for Defendant Norfolk Southern Railway Company, dated February 4, 2002 ("Butler Affidavit") (Doc. No. 57) explaining that Defendants' computerized data business system does not store "historic trip plans." Butler Affidavit ¶ 3. In her affidavit, Ms. Butler also averred that "numerous variables" account for how "blocks, trains, routes and schedules are used for transporting freight." *Id.* ¶ 4. Ms. Butler also noted that "not all products, *e.g.,* fruit, automobiles and salt, are treated identically in rail transportation." *Id.* Additionally, Ms. Butler explained that "transit time for rail transit is considered to be origin to destination ... and that [r]ail car turn time, or cycle time, is different than transit time, as it involves variables such as loading, unloading and car down time, which are not controlled by [Defendants]".

■ However interesting and helpful such explanations are, nothing in the Butler Affidavit negates the existence or accessibility of the requested documents or information to Defendants needed to enable Defendants to answer Plaintiff's Interrogatory No. 1. For example, Defendants' objection to Interrogatory No. 1 points out that "average turn times" depends on several factors, Defendants' Memorandum at 3, but the objection does not state that the actual "turn times" for the Defined Routes are not in fact available to Defendants in a form from which an "average turn time," as Plaintiff requests, can be calculated and provided to Plaintiff. Significantly, Defendants do not dispute that such "turn times" or "average turn times" are not relevant to Plaintiff's claims. Accordingly, Defendants' objections to Plaintiff's Interrogatory No. 1 is overruled. If Defendants are unable to provide "average" turn times, Defendants shall allow Plaintiff access to any record from which "average" times responsive to Interrogatory No. 1 can be readily computed.

Plaintiff's Request No. 1 seeks (a) records dealing with trip plans, service plans, service plans, block book pages, train schedules, transportation service plans, car scheduling data, service recovery plans, reports to the Surface Transportation Board, and (b) documents relating to service measurements, analysis of transit times, service consistency levels, service problems, traffic volumes, train or car velocities, turn times, or cycle times over the Defined Routes during the Designated Times. Plaintiff's Request No. 2, requests similar records created by Conrail available to Defendants. Accordingly, the court will address Defendants' objections to both Plaintiff's Requests No. 1 and 2 together.

As to Plaintiff's Request Nos. 1 and 2 for documents relating to rail freight service measurement, transit times, service consistency levels, service problems, traffic volumes, train or car velocities, turn times or cycle times over the Defined Routes during the relevant time period, Defendants do not deny all of the records, responsive to Request No. 1, exist. Rather, Defendants maintain that Defendants' records of cycle times, upon which its reports to the Surface Transportation Board and "Conrail Transaction Council," Plaintiff's Exhibit E at 3 (Defendants' Response to Plaintiff's Request No. 1) were based, contain only "*aggregated* cycle time information" and "transit [time] information" for the Defined Routes. *Id.* (underlining added). However, Defendants assert such "information is not route specific" and does not "distinguish between the types of cargo transported." *Id.*

■ Defendants' qualifications on the nature of the records sought by Plaintiff constitute an attempt to unilaterally "rewrite" Plaintiff's Requests so as to avoid compliance. Plaintiff's Request No. 1 does not distinguish between cycle time information in "aggregated" or non-aggregated form; nor does Plaintiff's request for documents pertaining to transit times depend on the nature of the cargo to which such data relates. Defendant also presumes Plaintiff's Request No. 1 is limited to salt, but it is not so limited. Although Defendants object to Request No. 1 on relevancy grounds, Defendants concede that the cycle times, if not in aggregate form, would be relevant. Defendants' Response to Request No. 1, Defendants' Memorandum at 4. The fact that the particular information, in the form allegedly available to Defendants, as to cycle time is not, in Defendants' opinion, readily ascertainable, does not negate the continued relevance of the information. Accordingly, Defendants' relevancy objection is overruled.

Further, as to Defendants' assertion that production in response to Plaintiff's Request No. 1 would be unduly burdensome, the court noted Defendants failed to provide an affidavit from a person with personal knowledge to support Defendants' burdensomeness objection. The Butler Affidavit makes no attempt to support Defendants' burdensomeness objection. Defendants' failure, since oral argument, to supply the requested affidavit of facts to support Defendants' claim of burdensomeness as directed by the court warrants rejection of this asserted ground for nonproduction. If compliance with Plaintiff's Request No. 1 was truly as burdensome as Defendants' claim, Defendants should have had no difficulty in promptly providing the

affidavit of support requested by the court over a year and one-half ago. The absence of Defendants' compliance, to date, thereof justifies the conclusion that Defendants' objection was interposed without a good faith basis. Accordingly, Defendants' burdensomeness objections as Plaintiff's Request No. 1 are overruled.

Defendants further argue that its objection to Plaintiff's Requests No. 1 and 2 requesting trip plan information should be sustained because Defendants "ha[ve] no need or business purpose for maintaining outdated and obsolete trip plans...." Defendants' Memorandum at 6. However, that Defendants have no present need to maintain records of such historical information does not negate that such records exist within Defendants' custody, control or possession. Defendants' current business needs or purposes to maintain a particular type of record cannot limit Plaintiff's entitlement to obtain relevant documents that were, at some time, within Defendants' control or possession, if presently available. As discussed, evidence of planned or scheduled transit times for the Defined Routes is relevant to whether shipments of Plaintiff's products were effected by Defendants with reasonable dispatch. *See Western Resources, Inc. v. Union Pacific Ry. Co.,* 2001 WL 1718369 *4 (D.Kan. November 26, 2001) (computerized car and train movement records relevant to breach of contract for delivery of coal as required by transportation agreements between parties). Accordingly, Defendants relevancy objection to Plaintiff's Request No. 2 is overruled. Additionally, the failure to provide an affidavit stating upon personal knowledge that a reasonably diligent search of Defendants' records shows no responsive documents exists, obliges the court reject Defendants' justification for non-production.

Exhibits submitted by Plaintiff provide persuasive grounds to find that the requested documents, responsive to Request Nos. 1 and 2 are within Defendants' "possession, custody or control," as provided by Fed.R.Civ.P. 34(a). First, in connection with Defendants' takeover of Conrail's routes, Defendants were required to submit to the Surface Transportation Board train schedules for the former Conrail routes, including the Defined Routes. Plaintiff's Memorandum at 8; Plaintiff's Exhibit G. Additionally, Defendants concede that Conrail train scheduling "may still exist." Defendants' Objection to Plaintiff's Document Request No. 1, Plaintiff's Exhibit E at 2. Second, Defendant Norfolk Southern's Annual Report for 1998, issued after Defendants' 1997 acquisition of Conrail assets and routes, implies unambiguously that Defendant, Norfolk Southern Corporation, had access to Conrail's scheduling documents. Plaintiff's Exhibit H at 2 ("If you [Defendants] don't *measure performance,* you don't know much about it. We [Defendants] *use a type of 'scorecard'* that tells us where we need to improve."). Thus, Defendants publicly represented that they had access to information upon which to evaluate their rail service over the former Conrail routes. Such an evaluation, which was intended to include service expected to be provided by Defendants using Conrail assets and rail routes, could not reasonably be made without access to empirical data or records measuring Defendants' rail service performance, including information as to Conrail's prior service record over the Defined Routes. Third, Defendants had access to Conrail's "block definitions" relevant to Plaintiff's Requests Nos. 1, 2 and 7. *Id.* at 3. Such records, as with other information described by Defendant Norfolk Southern's Annual Report, according to Norfolk Southern, allowed Defendants to coordinate "1,200 train schedules." *Id.*

Fourth, contrary to Defendants' assertions, train schedules for some of the Defined Routes do exist. Plaintiff's Exhibit I at 6. In her April, 2002 deposition, Ms. Butler acknowledged that Defendants maintained planned transit times for some of the Defined Routes. Plaintiff's Exhibit M at 30–31 ("185 hours"—South Lansing, New York to Cresson, Pennsylvania). At Ms. Butler's deposition, the following question was asked and: "Q: [a]s of June 1, 1999, .... did [Defendants] have planned *transit times* for those (the other Defined) routes?" and Ms. Butler gave the following answer: A: "*I'm certain that they did.* I do not know what they were." *Id.* at 31 (underlining added). Significantly, Defendants also offered to provide

Plaintiff with car movement records for shipments of Plaintiff's salt from January 1, 2000 to present. Exhibit 2 to Plaintiff's Local Rule 37 Certification at 2.

Additionally, several items, not disputed by Defendants, submitted by Plaintiff in support of the instant motion permit a reasonable inference that Defendants are in possession of "blocking book pages," as Plaintiff describes them, or "blocking page books," as Defendants refer to them. *Id.* According to Plaintiff, "[b]locking is essential to trip planning over a rail car's route and integral to the scheduling process. A blocking book or schedule will show how and when a particular rail car travels from origin to destination, and is probative of the normal and excepted transit time." Plaintiff's Memorandum at 9. Defendants did not dispute Plaintiff's description of the blocking book schedule. While Defendants assert in their objection to Plaintiff's Request No. 1 that they do not possess the blocking book pages within Plaintiff's request, according to Defendant Norfolk Southern Corporation's, 1998 Annual Report, Defendant reviewed "Conrail's Tables of 'block definitions,' which are *detailed* rules about groups of rail traffic carried on trains." Plaintiff's Exhibit H at 3 (underlining added). Despite the differences in Plaintiff's use of the phrase "blocking book pages" and Defendants' "blocking page books," in order for Defendants to assert they do not possess such records, Defendants must fairly have understood what types of records to which Plaintiff's Request referred. Coupled with Defendants' representation that it consulted Conrail's "table of 'block definitions' " in determining how to "integrate" the Conrail routes into Defendants' system, Plaintiff's Exhibit H at 3, the court concludes that the "blocking book pages" requested by Plaintiff for at least the Defined Routes were, contrary to Defendants' objection, available to Defendants. This conclusion is further supported by Defendants' statement of using "*blocking* and train operations plans" to find at the right combination of routes, terminals, "*blocking,* and train schedules to best meet the specific service and cost requirements of each movement." (underlining added). Plain-

tiff's Exhibit K at 1 (Defendant Norfolk Southern Operating Plan submitted to the Securities and Exchange Commission ("SEC") (undated but presumably post June, 1999)).[2]

Ample reasons also warrant a finding that Defendants have, contrary to their undocumented assertions, access to responsive information concerning Defendants' and Conrail's rail freight service issues on the Defined Routes. First, Defendants in their initial response to Plaintiff's Request Nos. 1 and 2, dated September 16, 2002, did not deny that records relating to transit times, service problems, traffic volumes, train and car velocity, return times or cycle times ("the quality of service records") were available to Defendants; rather, Defendants state Plaintiff's requests for such quality of service records is overly broad, burdensome and irrelevant. Plaintiff's Exhibit E at 2–3. In particular, in Defendants' Memorandum, filed January 24, 2003, Defendants claimed that, as to requested records covering Defendants' quality of service, "*as previously stated,* Norfolk Southern *does not possess*" quality of service records for the Defined Routes. However, in their responses and objections to Plaintiff's Request No. 1, dated September 16, 2002, approximately four months earlier, and prior to Plaintiff's instant motion to compel, no such claim was made by Defendants, and as noted, Defendants have also failed to provide the requested affidavit by a representative of Defendants with personal knowledge supporting the Defendants' assertion of unavailability as the court requested at oral argument.

Other evidence in the record reinforces the court's conclusion that Defendants have access to Conrail records responsive to Plaintiff's Request No. 2. As Plaintiff points out, Plaintiff's Memorandum at 11–12, following the Conrail merger, Defendants provided to the Surface Transportation Board reports including data on train starts and delays relating to freight train service on Defendants' Northern Region which according to Plaintiff

---

2. Although the copy submitted to the court states the document was submitted to the SEC, Plaintiff represents it was submitted to the Surface Transportation Board. Plaintiff's Memorandum at 9.

includes "many of the routes at issue." *Id.* at 11. *See* Plaintiff's Exhibit N (transmitting, *inter alia,* data concerning Defendant Norfolk Southern's "Northern Region Train Starts *and Delays.*") (underlining added). According to Plaintiff, Defendants' reports to the Surface Transportation Board "[i]ncluded . . . *data for* crew starts *and delays* for . . . rail yards . . . *located on the routes at issue.*" *Id.* (underlining added). For example, Defendant Norfolk Southern Corporation's 2001 Annual Report represents that Defendants "*measures* its [rail freight service] performance [based on data for] 'on-time departures at origins, point-to-point transit times and on-time arrivals at destinations.'" Plaintiff's Exhibit O at 2 (underlining added). Further, the Norfolk Southern 2001 Annual Report also states that "Norfolk Southern strengthened service reliability and consistency during 2001, *reducing* transit times for customer's freight . . ." (underlining added), noting that the company's review process "began with an examination of way bills, which *provided an accurate* database of traffic variation." *Id.* at 1; Plaintiff's Exhibit L at 6 (underlining added). If no records responsive to Plaintiff's Request No. 2 relative to freight service quality exist as Defendants claim, then the representation in Norfolk Southern Corporation's Annual Report describing service improvements over Defendants' 2000 reported operations, occurring within the Designated Period, may be misleading to the public, including shareholders, as not based on objective data as represented by Norfolk Southern. Such an apparent inconsistency between Defendants' contention on this motion and the record of Defendants' public statements regarding Defendants' attempts to measure Defendants' freight service improvements, after the Conrail acquisition, requires that Defendants' assertion, in opposition to the instant motion, that documents responsive to Plaintiff's Request Nos. 1 and 2, relating to Defendants' quality of freight service for the Defined Routes, be rejected.

In Plaintiff's Request No. 3, Plaintiff seeks documents covering Defendants' marketing reports and service reports, including reports of service interruption and customer complaints for the Designate Routes. Defen-

dants raised vagueness, overbreadth, undue burdensomeness, and relevancy objections. Defendants nevertheless claim to have provided responsive documents related to Plaintiff's complaints about Defendants' rail service. Plaintiff's Exhibit E at 3. Defendants, in addition to their objection to Plaintiff's Request, assert that (1) no similar customer complaint reports exist as to other customers, and (2) Plaintiff's motion "attempts to rewrite and expand the request to include other routes and 'overlapping routes' used by other shippers" and different freight, thus rendering Request No. 3 irrelevant. Defendants' Memorandum at 7. However, a careful reading of Plaintiff's motion papers, including Plaintiff's Memorandum, shows no such attempt to "rewrite" the Plaintiff's Request No. 3 to include "overlapping routes." Rather, Plaintiff's Memorandum states that Plaintiff's "request [No. 3] seeks [the requested reports] for traffic moving over the routes at issue." Plaintiff's Memorandum at 12. Thus, Plaintiff's Request No. 3 does not mention "overlapping routes" directly or by implication. *Id.* To the contrary, Plaintiff's request would yield records of complaints for similar products over the Defined Routes or closely related routes. Accordingly, Defendants contention that Plaintiff's Request No. 3 seeks irrelevant information is without merit.

The requested information responsive to Plaintiff's Request No. 3 will enable Plaintiff to negate Defendants' potential contention that any significant differences in the quality of freight service enjoyed by Cargill for its salt using the Defined Routes, prior to Defendants takeover of the Conrail routes, should be attributed to factors over which Defendants lacked control, including severe weather or other unique causes. Plaintiff's Memorandum at 12. Defendants' assertion that the only relevant complaints were those filed by Plaintiff also negates Defendants' vagueness, overbreadth, undue burdensomeness and relevancy objections. Defendants obviously understand clearly the scope of Plaintiff's Request No. 3 and it is not persuasive that producing customer complaints in addition to Plaintiff's would be unduly burdensome. Further, Defendants' assertion,

unlike an interrogatory answer, is not made by a person with knowledge of the actual facts of the extent of Defendants' record keeping for customer complaints. Finally, contrary to Defendants' contention, Plaintiff's motion makes no attempt to "rewrite" Request No. 3, rather, it is the Defendants who attempt to "rewrite" the request. Defendants' objections to Plaintiff's Request No. 3 are baseless, and therefore overruled.

Plaintiff's Request No. 4 seeks the same type of documents sought by Plaintiff's Request No. 3 as to records provided by Conrail to Defendants. Plaintiff's Exhibit E at 4. Defendants contend Conrail did not make any responsive documents available to it, thus Defendants claim they lack custody, control or possession of the requested documents. Defendants' Memorandum at 4. For support, Defendants rely upon a one page excerpt from the deposition of Ms. Butler. *Id.* However, Butler's deposition testimony does not discuss what, if any, responsive documents may (or may not) have been transferred by Conrail to Defendants. Moreover, Defendants do not specifically deny the existence of such Conrail documents. Indeed, their representation in Defendants' response to Request No. 4, that "Conrail did not make its data regarding service and transit times for the 'defined' route available to defendants," Defendants' Memorandum at 4, necessarily implies that Defendants when making their objection were aware that such documents in fact exist, *i.e.,* that the records existed under Conrail's control but were not turned over the Defendants. Coupled with Defendants' failure to provide to the court the requested affidavit based upon personal knowledge to substantiate Defendants' unsworn assertion, warrants finding that the requested documents exist and, based on Defendants' undisputed takeover of the Conrail assets, including the Defined Routes, that Defendants, as the acquiring company, retain control, if not actual physical custody and possession, Fed. R.Civ.P. 34(a), over the requested Conrail documents. Accordingly, Defendants objections are without merit and as such are overruled.

Plaintiff's Request Nos. 5 and 6 seek Defendants' car movement records for rail freight cars owned, leased, pooled or assigned to Plaintiff, Cargill or Akso Nobel for salt products shipped on Defendants' rail lines over the Defined Routes during the Defined Period, and any such records Defendants received from Conrail as a result of Defendants' takeover of the Conrail rail lines. Defendants asserted their general objections and also stated that no "service and transit times" for rail service over the Defined Routes were received from Conrail. Plaintiff's Exhibit E at 4–5. Defendants also claimed that specific rail car numbers were required to enable Defendants to search for the requested records. *Id.* at 4.

Plaintiff contends that Defendant's objections to Requests Nos. 5 and 6, that specific rail car numbers are necessary in order to comply with the Plaintiff's Requests Nos. 5 and 6, is negated by Butler's deposition testimony in which Ms. Butler explained that the tracking of particular Conrail freight cars being moved over Conrail's rail lines was accomplished by Conrail's TRIMS operating system, Plaintiff's Exhibit M at 52, and that this information was later transferred to the Defendants' ITMS computer system. *Id.* at 53. As of April 9, 2002, the date of Ms. Butler's deposition, Defendants' Exhibit B at 1, the Conrail rail car movement records from the TRIMS system were retained in Defendants' computer system. Plaintiff's Exhibit at 68. Moreover, Plaintiff points out that the rail car movement records can be accessed by reference to the designated consignor, which fact is indicated on the underlying rail car movement records, Plaintiff's Exhibit P, for Plaintiff's, Cargill's or Akso Nobel's salt shipments. Finally, as noted, Defendant failed to provide to the court an affidavit supporting its claimed inability to provide the car movement records called for by Plaintiff's Requests Nos. 5 and 6, thus warranting a finding that Defendants' assertions of unavailability cannot be factually supported. Accordingly, Defendants' objections are overruled, and Defendants' asserted inability to comply with Plaintiff's Request Nos. 5 and 6 is without merit.

Plaintiff's Request No. 7 seeks documents relating to Defendants' standards and goals, planned transit times, service standards, trip plans, car trip plans, car scheduling plans or rules, train blocking plans, service planning documents or car or train scheduling directives for the Defined Routes and Time Periods. In their response to this Request, Defendants reassert their objections to Plaintiff's Request No. 1. As discussed, Discussion, *supra*, at 12–19, these objections are overruled. However, Defendants did not oppose Plaintiff's motion as to this Request. Moreover, according to Ms. Butler, "planned transit times" for the Defined Routes are in Defendants' possession. Plaintiff's Exhibit M at 30–31. Specifically, Ms. Butler testified that she was "certain" Defendants possessed such records. *Id.* at 31. Based on the court's overruling of Defendants' objections to Plaintiff's Request No. 1 and its similarity to the scope of Plaintiff's Request No. 7 and Defendants' failure to oppose the instant motion as to Plaintiff's Request No. 7, Defendants' objections as to Plaintiff's Request No. 7 are also overruled.

Plaintiff's Request No. 8 seeks transportation contracts or agreements between Defendants and Conrail and Cargill and Akso Nobel for salt product shipments over the Defined Routes. Defendants objected on general grounds and asserted such contracts were confidential and did not reference transit times. Defendant's Memorandum at 9. Additionally, Defendants argue that the Cargill–Akso Nobel shipments were directed to different destinations than those specified by Plaintiff thus rendering any contractual transit time commitments irrelevant to Plaintiff's claim. *Id.*

■ Plaintiff contends that despite any differences in destinations, the requested contracts may contain information as to whether Defendants breached their implied covenant of good faith in entering into the transportation contract with Plaintiff. Information relating to a railroad's contractual relationship with another shipper is relevant to a shipper's breach of contract claim as such information may show the railroad carrier had knowledge of its inability to perform based on its existing obligation to fulfill prior commitments and the rail carrier's consequent lack of capacity to meet any additional commitments (such as Plaintiff's requirements) for similar products over similar routes. *See Western Resources, Inc. v. Union Pacific Ry., supra*, at \*3. Accordingly, there is no merit in Defendants' relevancy objection, and Defendants failed to provide a basis for their burdensome objection. Defendants' vagueness and overbreadth objections are wholly without foundation. Finally, Defendants did not proffer such contracts for an *in camera* examination nor provide an affidavit supporting their claim of confidentiality. Thus, Defendants' objections to Plaintiff's Request No. 7 are overruled in all respects.

Plaintiff's Request No. 9 requests records, minutes or notes of meetings between Defendants, Conrail, Cargill or Akso Nobel relating to any shipments of Cargill and Akso Nobel products, *i.e.*, commercial rock salt, between the origins and destination described in the Defined Routes. Defendants asserted generalized objections. While Plaintiff contends that Request No. 9 refers to information concerning Defendants performance as to "the same or similar routes" instead of "the defined Routes" as stated in the Request, Defendants' Memorandum at 10; Plaintiff's Memorandum at 16, Defendants do not specifically deny that the requested records may exist as to Cargill–Akso Nobel salt shipments over the Defined Routes. Comparable shipment times for similar products hauled by Defendants over the Defined Routes are relevant to Plaintiff's claim. Defendants relevancy objections are therefore overruled. However, to the extent Plaintiff's requests seeks records covering "similar routes" the objection is sustained as such issue was not the subject of the good faith pre-motion resolution requirement of Fed.R.Civ.P. 37(a)(2)(A). Defendants' other objections to this request are overruled as without basis.

■ Defendants also maintain that because Plaintiff's expert's report calculated reasonable dispatch times for the Defined Routes without the requested discovery at issue, Plaintiff's "need for this information is dubious." Defendants' Memorandum at 2.

Although Fed.R.Civ.P. 26(b)(2)(i) permits a court to bar discovery that "is obtainable from some other source that is more convenient, less burdensome, or less expensive," Defendants failed to timely request such limitation to any of Plaintiff's discovery requests and, accordingly, such potential objection is waived. *Land Ocean Logistics, Inc., supra,* at 235. *See also* Baicker–McKee, Janssen, & Corr, FEDERAL RULES HANDBOOK, (Thompson–West 2004) at 672 (noting that waiver is implied in Rule 34(b) requiring objections be explicitly stated (citing cases)). Additionally, while Defendants assert that Plaintiff's expert's report was based on "NS [Defendant Norfolk Southern Railway] car movements records, train schedules, timetables, maps . . . ," Defendants' Memorandum at 2, Plaintiff's expert's report states quite plainly that its calculation of "Roundtrip Transit Times" over the Defined Routes, Defendants' Exhibit A at 4, is based on *"partial data"* from Defendants' "car movement records, train schedules, timetables, maps." *Id.* (underlining added). Indeed, the report notes that "[h]istorical car movement records have been requested from [Defendants] and as of the date of this report the data has not been supplied." *Id.* Because of the lack of the requested information, Plaintiff's expert prefaces his analysis with the disclaimer that "[t]he opinions that follow should be considered preliminary." Defendants' Exhibit A at 3. Thus, it is incorrect to imply, as Defendants do, that Plaintiff's discovery requests are unnecessary to Plaintiff's ability to make out a case against Defendants. Defendants nowhere in the record concede that Plaintiff's expert's conclusions, that Defendants' post Conrail acquisition rail service for Plaintiff's product over the Defined Routes, Defendants' Exhibit at 7, violates the reasonable dispatch standard for carrier liability. Therefore, there is no basis to find Plaintiff's requests unnecessary for the reason that the expert was able to offer a preliminary analysis of the reasonable dispatch issue without the requested information. Moreover, even if Plaintiff already had the requested information, it is familiar law that, absent a court order, the requested party may not refuse discovery on the ground that the requesting party is in possession of the requested discovery. *Land Ocean, supra,* at 239 (citing cases). Therefore, Defendants' contention that Plaintiff's discovery requests may be refused as "unneeded" is without merit.

In sum, Defendants have failed to sustain their burden that the documents subject to Plaintiff's Requests Nos. 1—9 do not exist, are not relevant, and would be unduly burdensome to produce. Accordingly, except as to Request No. 9's requests for documents relating to shipment times over "similar routes," Plaintiff's motion to compel should be GRANTED.

Further, as the court finds Defendants' failure to provide the discovery necessitating the instant motion to be without substantial justification, Defendants shall reimburse Plaintiff its reasonable costs, including attorney's fees, incurred by Plaintiff in connection with the motion. Fed.R.Civ.P. 37(a)(4)(A).

## CONCLUSION

Based on the foregoing, Plaintiff's motion (Doc. No. 37) is GRANTED, in part, and DENIED, in part. Defendants shall provide copies of each document requested under Plaintiff's Third Request for Documents Nos. 1–9 (except as to "similar routes"), and shall serve complete answers to Plaintiff's Third Set of Interrogatories Nos. 1(a)—(g) *not later than 45 days* after entry of this Decision and Order.

Plaintiff shall file its affidavit of costs *not later than 10 days after* entry of this Decision and Order; Defendants shall file their response *within 10 days* of receipt of Plaintiff's affidavit. Oral argument shall be at the court's discretion.

SO ORDERED.

## Decision and Order Denying Reconsideration

## JURISDICTION

This matter was referred to the undersigned by Hon. David G. Larimer on October 24, 2002 for pretrial matters pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). It is presently before the court on Defendants' motion for reconsideration filed August 20, 2004 (Doc. No. 61).

## BACKGROUND

Plaintiff filed, on December 23, 2002, a motion to compel (Doc. No. 37) together with a supporting affirmation of Paul J. Yesawich, III, Esq., dated December 23, 2002 (Doc. No. 38) ("Yesawich Affirmation") along with Exhibits A—P ("Plaintiff's Exhibit(s) ___") and a Memorandum of Law ("Plaintiff's Memorandum"). Defendants' Memorandum of Law in Opposition was filed January 24, 2003 (Doc. No. 42) ("Defendants' Memorandum"). By letter to the court dated January 31, 2003, Plaintiff replied to Defendants' arguments in opposition to Plaintiff's motion (Doc. No. 44) ("Plaintiff's Reply"). Oral argument was conducted on February 5, 2003, and decision reserved.

At oral argument, the court directed Defendants to provide affidavits based on personal knowledge supporting Defendants' contentions that Defendants were unable to comply with Plaintiff's document requests because responsive documents do not exist, are not available to Defendants, or that such documents are too burdensome to be produced.[1] Doc. No. 46 (minute entry of the oral argument and the court's directions to Defendants.)

In June 2004, not having received further communications from either party regarding the status of the motion, or the court's direction to provide the requested affidavits, the court, by its judicial assistant, contacted Plaintiff's counsel, Laura Smalley, Esq., and was advised that while Defendants had provided some followup information to Plaintiff (which had not been filed with the court), such information was unsatisfactory and that Plaintiff requested the court proceed to decide the merits of Plaintiff's motion.[2] Accordingly, the court took up the matter and, on August 13, 2004, issued its Decision and Order granting and denying the Plaintiff's motion in part, and awarding costs (Doc. No. 58). An Amended Decision and Order was filed on August 19, 2004 (Doc. No. 59) (the "Amended D & O").

On August 20, 2004, Defendants moved for reconsideration of the Decision and Order (Doc. No. 61) ("Defendants' Motion"), asserting that Defendants had fully complied with the court's direction by serving Supplementary Responses ("Defendants' Supplemental Responses"), Exhibit 1 to Defendants' Motion, together with five affidavits by four of Defendants' corporate officers which, according to Defendants, explained why Defendants could not respond to Plaintiff's discovery requests at issue on Plaintiff's motion to compel. Defendants' Exhibit A—E. (Affidavit of Tim Heilig, Assistant Vice–President, Transportation Network, Defendant Norfolk Southern Corporation dated March 25, 2003, addressing Plaintiff's Interrogatory No. 1 and Plaintiff's Document Requests Nos. 1 and 7) (Defendants' Exhibit A) ("Heilig Affidavit I"); (Affidavit of Tim Heilig, dated March 25, 2003, addressing Plaintiff's Document Requests Nos. 2, 4, 5, 6, 8, and 9) (Defendants' Exhibit B) ("Heilig Affidavit II"); (Affidavit of Dezora Martin, Secretary, Defendant Norfolk Southern Corporation, dated March 3, 2003, addressing Plaintiff's Request for Documents from Conrail Corporation) (Defendants' Exhibit C) ("Martin Affidavit"); (Affidavit of Deborah H. Butler, Vice–President, Customer Service, Defendant Norfolk Southern Corporation dated March 26, 2003, addressing Plaintiff's Interrogatory No. 1 and Requests Nos. 3) (Defendants' Exhibit D) ("Butler Affidavit"); (Affidavit of Robert T. Plain, Marketing Director, Chemical Marketing, Defendant Norfolk Southern Railway, dated March 14, 2003, addressing Plaintiff's Requests Nos. 8 and 9) (Defendants' Exhibit E) ("Plain Affidavit"). On September 3, 2004, Plaintiff filed the affirmation of Laura W. Smalley, Esq., in Opposition to Defendants' Motion (Doc. No. 65). Thereafter, on September 9, 2004, Defendants filed a Reply Brief in Support of Defendants' Motion for Reconsideration

---

1. Defendants also claim, for similar reasons, to be unable to answer Plaintiff's Second Set of Interrogatories, dated May 29, 2002, Interrogatory No. 1, Plaintiff's Exhibit D, regarding average "turn times," the time needed to move a freight car from point of origin to its destination and back to the origin, over the rail routes at issue (the "Defined Routes").

2. The court was not informed that the information included the affidavits submitted by Defendants in support of the instant motion.

(Doc. No. 66) ("Defendants' Reply"). Oral argument was considered unnecessary. Based on the following, Defendants' Motion for Reconsideration is DENIED.

## FACTS [3]

The court assumes familiarity with the papers previously filed in connection with the Plaintiff's motion to compel (Doc. Nos. 37, 39, 42, 44, and 57). However, in the interest of clarity, the court will refer to such papers, the Amended Decision and Order, and the papers filed in regard to the Defendants' motion.

In this action, Plaintiff claims a breach of a contract for freight service provided by Defendant Norfolk Southern Railway Company ("Norfolk Southern Railway"), a wholly owned subsidiary of Defendant Norfolk Southern Corporation ("Norfolk Southern Corporation"). Plaintiff also asserts claims for violations of 49 U.S.C. § § 11101(a) and 11121(a)(1), as well as 49 C.F.R. § 1035(b)(2) and 49 U.S.C. § 11706. The gravamen of Plaintiff's claims is that Norfolk Southern Railway failed to transport Plaintiff's commercial rock salt from Plaintiff's points of origin in New York state and Ohio to destinations in western Pennsylvania and Ohio with "reasonable dispatch" causing Plaintiff substantial lost profits and customers.

Prior to June 1999, Plaintiff had a transportation contract with Consolidated Rail Corporation, Inc. ("CRC" or "Conrail") a wholly owned subsidiary of Conrail, Inc. ("Conrail, Inc."), a major railroad common carrier, for freight shipments of Plaintiff's salt products over the same routes used by Norfolk Southern Railway for Plaintiff's shipments.[4] In May 1997 Norfolk Southern Corporation acquired fifty percent ownership of Conrail, Inc.[5] The instant action arises from a contract by Norfolk Southern Railway to provide freight services for Plaintiff for Plaintiff's salt products, entered into on June 8, 1999, using the same rail routes previously used by CRC to provide similar freight carriage to Plaintiff for its salt products. However, according to Plaintiff, contrary to assurances given by Norfolk Southern Railway, and in violation of the transportation contract between the parties and federal law, Plaintiff's salt products were not shipped with reasonable dispatch resulting in extra transportation costs and substantial economic losses to Plaintiff.

To assist Plaintiff in establishing its claims, Plaintiff sought a variety of Defendants' and Conrail's records, and other information, relating to Defendants' and Conrail's rail services over rail routes previously used by Conrail, and, since June 1999, by Norfolk Southern Railway, to provide freight service to Plaintiff and two of Plaintiff's competitors, Akzo Noble Salt and Cargill. Plaintiff's objective was to establish that, as a result of rail line congestion created by Defendants' acquisition of the Conrail assets, which increased Norfolk Southern Railway's size by 50%, Plaintiff's Exhibit L at 17 n. 2, 18, Defendants did not achieve the delivery times represented to Plaintiff by Norfolk Southern Railway to induce Plaintiff to contract with Norfolk Southern Railway for freight services, and that the actual freight delivery time for Plaintiff's products by Nor-

---

**3.** Taken from the pleading and papers filed in this case.

**4.** Conrail, Inc. was created by Congress in 1976 through an amalgamation of several bankrupt rail lines, including Pennsylvania Railroad and the New York Central Railroad. "A Brief History of Conrail," *http://www.conrail.com/history.htm.* Prior to the completion of Defendants' acquisition of Conrail's properties on June 1, 1999, Conrail, Inc. operated its rail system through its wholly owned subsidiary, Consolidated Rail Corporation ("CRC"), which in turn owned two wholly owned subsidiaries, Pennsylvania Lines, LLC (the former Pennsylvania Railroad) and New York Central Lines, LLC (the former New York Central Railroad) (Plaintiff's

Exhibit L at 18; Norfolk Southern Corporation Annual Report for year-ending December 31, 2004 as filed with the Securities and Exchange Commission on March 2, 2005, at K 3 ("Norfolk Southern Corporation 10K for 2004")). Following completion of the merger on June 1, 1999, Norfolk Southern Railway operated the Pennsylvania Lines, LLC rail lines under lease agreements with CRC and CSX Transportation operated the New York Central, LLC rail system. *Id.*

**5.** The other fifty percent was acquired by CSX Transportation Corporation ("CSX Transportation"), a major U.S. railroad company. Plaintiff's Exhibit L at 36; Norfolk Southern Corporation 10K for 2004 at K 3.

folk Southern Railway over the former Conrail routes ("the Defined Routes") did not meet the reasonable dispatch standard. Plaintiff's Memorandum at 3–4.

At issue on Plaintiff's motion to compel, filed December 23, 2002, and the subject of the Amended Decision and Order, were nine requests for document production pursuant to Plaintiff's Third Request for Documents dated August 13, 2002 ("Plaintiff's Request(s) Nos. ___") and Interrogatory No. 1 propounded in Plaintiff's Second Set of Interrogatories, dated May 29, 2002 ("Plaintiff's Interrogatory No. 1").

Specifically, Plaintiff's Request No. 1 sought "[a]ll documents, including but not limited to, trip plans, service plans, blocking book pages, train schedules, transportation service plans (TSP), car scheduling data, service recovery plans, reports to the Surface Transportation Board (STB),[6] and documents which relate to or comprise any service measurements analyses of transit times, service consistency levels, service problems, traffic volumes, train or car velocities, turn times or cycle times over the defined Routes or over other routes which may overlap the defined Routes beginning September 1, 1998 (or the earliest date for NSC/NSR records) until September 1, 2000." Plaintiff's Request No. 1. Plaintiff's Exhibit C at 4 (parenthetical material in original) (underlining added). The "Defined Routes" are described as seven railroad routes stated between locations in New York, Ohio, and Pennsylvania from and to which Plaintiff shipped its salt products as provided by Defendants' rail service. Id. at 3–4. According to Plaintiff, two competitors, Akzo Nobel and Cargill, shipped their salt products with Norfolk Southern Railway over the same routes and by Norfolk Southern Rail to transport Plaintiff's salt to its destinations.[7] Yesawich Declaration ¶¶ 5–6.

Plaintiff's Request No. 2 requested "documents that may be of Conrail origin passed on to or available to NSR/NSC as a result of their acquisition of Conrail assets and/or the transfer of data from Conrail [to Defendants]" identical to those described in Plaintiff's Request No. 1. Plaintiff's Exhibit C at 4.

For their response to Plaintiff's Request No. 1, Defendant objected on grounds of undue vagueness, overbreadth, burdensomeness, and a lack of relevancy for discovery purposes. Plaintiff's Exhibit E at 2. Specifically, Defendants further stated that they were not in possession of "trip plans, service plans, blocking page books, train schedules, transportation service plans or car scheduling data responsive to this request." Id. Defendants also acknowledged that train schedules promulgated by Conrail, prior to Defendants' acquisition of Conrail assets, for the Defined Routes "may still exist, but those schedules do not identify what traffic moved in what blocks and from what locations," and therefore, according to Defendants, "these schedules contain no relevant information and their production would be burdensome." Id. at 203. Additionally, Defendants responded that reports to the Surface Transportation Board and Conrail Transaction Council, an entity not referred to or defined by Plaintiff in its Document Requests, or described by Defendants in their response, "may contain aggregated cycle time information which may include, in part, transit information for the 'defined' routes. However, this information is not route specific, nor does it distinguish between the types of cargo transported." Id. at 3.

As to Plaintiff's Request No. 2 seeking Conrail records covering the same documents as requested in Plaintiff's Request No. 1, Defendants reasserted their responses to Plaintiff's Request No. 1 adding that "Conrail did not make its data regarding service and transit times for the 'defined' routes available to defendants." Plaintiff's Exhibit E at 3.

In opposition to Plaintiff's motion to compel as to Plaintiff's Requests Nos. 1 and 2, Defendants reiterated their position that the only categories of responsive documents

---

6. Formerly the Interstate Commerce Commission.

7. As to Cargill, Plaintiff asserts that although Cargill's destinations were not identical to Plaintiff's, nevertheless large portions of the former Conrail routes used to ship Cargill salt "overlapped" those utilized for Plaintiff's cargo by Defendants. Id.

available to Defendants were "pre-acquisition Conrail train schedules and STB reports," but that as the information in these documents "is aggregated," *i.e.,* "not broken down" to the Defined Routes, the documents are "irrelevant" to the lawsuit. Defendants' Memorandum at 5. Defendants also amended their original responses to Plaintiff's requests by stating that in regard to "the remaining documents requested, *Norfolk Southern* does not possess responsive documents." Defendants' Memorandum at 5 (underlining added). Defendants further asserted that while their employee, Deborah Butler, during her deposition on April 9, 2002, was unable to say whether planned *transit times* for the Defined Routes for 1999 remained available to Defendants as of the date of the deposition, Defendants had "no need" to maintain "outdated and obsolete *trip plans.*" Defendants' Memorandum at 6 (underlining added).

In its reply, Plaintiff noted that Defendants' admission that responsive documents in "aggregated" form existed negated Defendants' representation that no responsive documents within the scope of Plaintiff's requests were available to Defendants and, contended specifically, that "train schedules" by their nature could not be amenable to any form of aggregation as Defendants asserted. Plaintiff's Reply at 2. Plaintiff further noted that Ms. Butler's deposition testimony confirmed the existence of "transit times" for 1999 and did not deny the existence of "trip plan," and that although Plaintiff had, prior to filing its motion, requested an affidavit from an employee of Defendants' with personal knowledge of the facts regarding Defendants' record retention policies and procedures for Defendants' and Conrail's train schedules and trip plans, no such affidavit was provided by Defendants.[8] *Id.* Plaintiff also noted that in the absence of such explanations, Plaintiff could not determine whether destruction of responsive information, post-suit, by Defendants may justify sanctions based on Defendants' spoilation of relevant evidence. *Id.* at 2–3.

In the Amended Decision and Order, the court rejected Defendants' objections and assertions that responsive documents were not available to Defendants. Amended D & O at 12–19. In particular, the court observed that Defendants did not deny responsive records existed, that Defendants refused to provide responsive information even if in "aggregated" form (Defendants have not provided any details of the basis on which Defendants determined the data was "aggregated" for this purpose), and that such a basis of a refusal to respond was improper. Amended D & O at 12–13. The court also rejected Defendants' relevancy objections and observed that Defendants' burdensomeness objection had not been supported by an affidavit based on personal knowledge. *Id.* at 13. *See also Roesberg v. Johns–Manville Corp.,* 85 F.R.D. 292, 296–97 (E.D.Pa.1980) (generalized objections that a discovery request is unduly burdensome are insufficient; rather, the party objecting to the requested discovery on the ground of undue burdensomeness must submit an affidavit or offer other evidence "revealing the nature of the burden"). As well, Defendants' assertion that Defendants lack of business need for retaining old trip plans was rejected by the court as failing to establish that trip plan information within Plaintiff's request presently do not exist. *Id.* at 14. Plaintiff also pointed to Ms. Butler's deposition testimony stating that the Defendants had established planned transit times for freight traffic on the Defined Routes. *Id.* at 15–16. Further, the court noted statements in Norfolk Southern Corporation's 1998 Annual Report, Plaintiff's Exhibit H at 10, strongly implying Defendants' access to responsive documents in Conrail's possession including, for example, train blocking information. *Id.* at 15–16.

The court also observed that while in their opposition to Plaintiff's *motion to compel,* Defendants stated that responsive documents were unavailable to Defendants, no such assertion was included in Defendants' responses to Plaintiff's requests served by Defendants four months earlier. *Id.* at 17–18. Additionally, the court pointed to other evidence in the record supporting a finding that Defendants in fact had access to responsive documents for both Defendants and Conrail, including references to Defendants' Report

---

8. To date, Defendants have failed to provide such an affidavit.

to the Surface Transportation Board on the progress of merging Conrail assets into the Norfolk Southern Railway system, and a statement in Norfolk Southern Corporation's 2001 Annual Report describing Norfolk Southern Railway's post-Conrail acquisition service issues and improvements. *Id.* at 17–19; Plaintiff's Exhibit L at 18.

In support of Defendants' motion for reconsideration as to the court's finding regarding Plaintiff's Requests Nos. 1 and 2, Defendants again asserted, as Defendants had in their initial responses, that (i) Defendants did not possess responsive documents for the period June 1, 1999 through September 1, 2000, (ii) it is "unknown" whether any responsive documents for the period September 1, 1998 through May 31, 1999 exist, as Conrail operated the Defined Routes during such period, implying Defendants lacked possession, custody or control over such documents, and (iii) that Defendants may possess preacquisition Conrail train schedules, and Surface Transportation Board reports responsive to the requests, however, according to Defendants, such information being in an "aggregate" form, was not specific to the Defined Routes as specified in Request No. 1. Defendants' Supplemental Response at 2–3.

Defendants also relied upon an affidavit of Mr. Tim Heilig, Norfolk Southern Corporation Assistant Vice President for Transportation (Heilig Affidavit I). In the affidavit, Mr. Heilig stated he was personally familiar with documents responsive to Plaintiff's Interrogatory No. 1 regarding "transit times," and documents responsive to Plaintiff's Requests Nos. 1 and 7. According to Mr. Heilig, Defendant Norfolk Southern Railway tracks the time for freight to move between the points of origin and destination ("transit times"), but not the time from origin to destination and back to the point of origin ("turn" or "cycle times") as requested by Interrogatory No. 1. Heilig Affidavit I, ¶¶ 2, 4. Additionally, Heilig reiterated Defendants' initial response that based on his "personal knowledge," Defendants did not maintain or possess *any* information or documents *specifically* responsive to Interrogatory No. 1 or

Plaintiff's Request No. 1. Heilig Affidavit I, ¶ 3.

Regarding Plaintiff's Request No. 2, Defendants' Supplemental Response states that Defendants did not acquire any data or documents "regarding service and transit times" for the " 'defined' routes." Defendants' Supplemental Response at 3. Defendants also stated that Defendants lack any *"legal or practical control or influence over ...* Conrail." *Id.* (underlining added). Therefore, according to Defendants, Plaintiff must seek documents responsive to Plaintiff's Request No. 2 from Conrail. *Id.* Defendants further pointed to Mr. Heilig's second affidavit, Heilig Affidavit II, denying Defendants received any responsive documents from Conrail, and the Affidavit of Dezora M. Martin, Corporate Secretary of Norfolk Southern Corporation stating Defendants cannot "unilaterally control the functions and affairs of Conrail" and lack "the unilateral legal authority to direct Conrail employees to provide" responsive discovery to Plaintiff. Martin Affidavit ¶ 7–8. Additionally, Defendants stated that although Ms. Butler acknowledged in her deposition testimony that trip plans for the Defined Routes may have existed, Butler did not testify that trip plans responsive to Request No. 2 were presently available to Defendants. Defendants' Memorandum at 5.

In his affidavit regarding Plaintiff's Request No. 2, Mr. Heilig averred that he had personal knowledge of documents responsive to Request No. 2 "as they pertain to Conrail," and that neither Norfolk Southern Corporation nor Norfolk Southern Railway received from Conrail documents "specifically" responsive to Plaintiff's requests. Heilig Affidavit II, ¶¶ 2, 3. Mr. Heilig did, however, confirm that Conrail reports, pertaining to Plaintiff's Request No. 2 (seeking Conrail records responsive to Plaintiff's Request No. 1), to the Surface Transportation Board and the Conrail Transaction Council, an entity not otherwise described in the record, were received by Defendants, albeit that the data or information contained in such documents was in "aggregated" form, and not specific to any of the Defined Routes. Heilig also stated that Defendants may also have received "trip plans" from Conrail but that such plans

were "overwritten," presumably by Defendants. *Id.* ¶ 4. As the court determined such alleged "aggregated" information was within the scope of Plaintiff's Request No. 1, and that Defendants failed to sustain their burden to each objection, including burdensomeness, should have been provided to Plaintiff, Defendants' objections to Request No. were overruled. Amended D & O at 13.

In her affidavit, submitted in support of reconsideration, Ms. Martin stated that (i) fifty percent of the voting shares of Conrail are owned by Norfolk Southern Corporation, (ii) voting control of Conrail's board of directors is divided equally between Norfolk Southern Corporation and CSX Transportation Corporation, the other 50% owner of Conrail, (iii) Conrail board action requires unanimity, and (iv) that Defendants lack unilateral legal or practical control over Conrail and the capacity to direct Conrail to provide Conrail documents responsive to Plaintiff's requests. Martin Affidavit ¶ ¶ 4–8.

Plaintiff's Request No. 3 seeks all Defendants' "reports, studies or analyses" pertaining to Defendants' rail traffic over the Defined Routes for the period September 1, 1998 and September 1, 2000. Plaintiff's Exhibit C at 5. In particular, Plaintiff sought "marketing," "service," "system," "service interruption reports," "customer service complaints or analyses of service levels" for rail traffic over the Defined Routes between September 1, 1998 and September 1, 2000. Defendants' response stated that all such documents·had been provided. Plaintiff's Exhibit E at 3. Nevertheless, Defendants also asserted the request was vague, overbroad, burdensome and irrelevant. *Id.* Additionally, Defendants claimed Plaintiff, in its motion, amended its original request to cover "overlapping routes used by other shippers," rendering the request irrelevant. Defendants' Memorandum at 7.

In the Decision and Order and Amended Decision and Order, the court rejected Defendants' arguments as to Plaintiff's Request No. 3 finding, as with Defendants' objections to Plaintiff's Requests Nos. 1 and 2, that Defendants had failed to provide affidavits based on personal knowledge sufficient to support Defendants' claims of undue burden-someness or unavailability in response to Plaintiff's Request No. 3. Amended D & O at 19–20. The court specifically found that in the absence of such a factually based declaration, Defendants could not sufficiently verify their assertion that only Plaintiff had filed any service complaints with Norfolk Southern Railway as the Defendants' responses to Plaintiff's Document Request was signed by an attorney with Defendants' law firm, not a person with actual knowledge of Defendants' records and the completeness of any search thereof in a good faith effort to locate responsive documents. Amended D & O at 20. As well, the court rejected Defendants' contention, Defendants' Memorandum at 6–7, that Plaintiff's motion was an attempt to modify its Request No. 3 as originally served, by seeking the requested records as to "overlapping routes." Amended D & O at 19–20.

The court also overruled Defendants' relevancy objections finding that Defendants had failed to demonstrate that other than Plaintiff's service complaints, which are the subject of the instant litigation, no responsive records exist and that while Plaintiff alluded to "overlapping routes" in its papers, Yesawich Affirmation ¶ 5, Plaintiff's Memorandum at 13, such reference did not enlarge Plaintiff's Request No. 3. Rather, the court found that the reference to "overlapping" routes served to clarify that if Akzo Nobel and Cargill used Defendants' routes to ship product to similar destinations which routes "overlapped" the routes utilized by Defendants to ship Plaintiff's product, information relating to quality of service on such "overlapping routes" would be relevant to Plaintiff's claim. Amended D & O at 20.

In support of reconsideration, relating to Plaintiff's Request No. 3, Defendants submitted an affidavit of Deborah Butler, Vice President of Customer Service for Defendant Norfolk Southern Corporation. In Plaintiff's affidavit, Ms. Butler states that regarding "[Plaintiff's] Request No. 3, to the extent that the NS [Defendant Norfolk Southern Corporation] possess [*sic*] the documents requested therein, I am certain they had been made available to our counsel for production

to Plaintiff." Butler Affidavit ¶ 5 (bracketed material added).[9]

Request No. 4 seeks the same information described in Request No. 3 insofar as such reports, studies, or analyses were made by Conrail for rail traffic over the Defined Routes and transferred or available to Defendants as a result of Defendants' acquisition of Conrail assets. Plaintiff's Exhibit E at 5. Defendants responded with the same general objections stating specifically that Conrail did not make its "data regarding service and transit times for the 'defined Routes' available to defendants." Plaintiff's Exhibit E at 4. Opposing Plaintiff's motion to compel as to Plaintiff's Request No. 4, Defendants reiterated their position that any responsive Conrail documents had not been provided to Defendants. Defendants' Memorandum of Law at 7. However, Defendants represented that such information that Conrail had provided to Defendants, such as trip plans had been "written over as new plans were developed" (citing Butler Deposition at 54). In its reply, Plaintiff noted that Ms. Butler did not testify that all such responsive records had been "written over," rather, that they would be "written over," only when changed; furthermore Ms. Butler could not state that no hard copy of such records, even if electronically "written over," remain available to Defendants. Nor did Ms. Butler particularized the process by which such over-writing occurs. Plaintiff's Reply at 3. Finding Defendants' objection did not sufficiently negate the probable existence of responsive records, coupled with the absence of a detailed supplemental affidavit explaining why such records, either in electronic or hard copy form, were in fact unavailable to Defendants for production, the court overruled Defendants' objections. Amended D & O at 21.

On Defendants' reconsideration motion, to further support their failure to produce documents responsive to Plaintiff's Request No. 4, Defendants submitted affidavits of Mr. Tim Heilig, Assistant Vice President of Transportation Network for Defendant Norfolk Southern Corporation, and Ms. Dezora Martin, Secretary of Defendant Norfolk Southern Corporation. Regarding Plaintiff's Request No. 4, Mr. Heilig, echoing Ms. Butler, stated that while Defendants "may have obtained or received from Conrail trip plans, these plans were overwritten as new plans developed." Heilig Affidavit II ¶ 4. Additionally, according to Mr. Heilig, neither Defendant "obtained or received from Conrail data regarding service and transit times for the defined Routes." *Id.* Ms. Martin averred, *inter alia,* that Defendant Norfolk Southern Corporation and CSX Transportation Corporation, another major national railroad company, jointly own all the shares of a holding company of which Conrail is a wholly owned subsidiary. Martin Affidavit ¶ 4. As a result, Norfolk Southern Corporation elects fifty percent of the directors of the holding company which in turn owns Conrail, Inc., and decisions of the board require a unanimous vote. *Id.* ¶ 5. Ms. Martin also stated that neither Defendant "may legally or practically unilaterally control the function and affairs of Conrail." *Id.* ¶ 7.

In its Request No. 5, Plaintiff requested all records relating to the movement of rail freight cars "owned, leased, pooled or assigned to Plaintiff, Akzo Nobel Salt, Inc., or Cargill, Inc., used to transport salt over the defined Routes between September 1, 1998 and September 1, 2000." Plaintiff's Exhibit E at 5. Plaintiff's Request No. 6 seeks the same information for Conrail's car movements provided or available to Defendants as a result of Defendants' acquisition of Conrail assets for the period June 1, 1997 and September 1, 1999. *Id.*

For their objection to Request No. 5, Defendants asserted their generalized objections, and that Conrail did not make its records available to Defendants. Plaintiff's Exhibit E at 4. Defendants further objected that production of car movement records required "specific information." *Id.* Other than "rail car numbers," Defendants did not further describe what other "specific information" was required to enable Defendants to produce the requested information. *Id.* As

---

9. Neither of the other two Norfolk Southern Corporation officers, Tim Heilig and Dezora Martin, who submitted affidavits in support of reconsideration, addressed the adequacy of Defendants' responses to Plaintiff's Request No. 3.

to Plaintiff's Request No. 6, Defendant repeated their objection based on Conrail's failure to provide responsive records to Defendants. *Id.*

In support of its motion regarding Requests Nos. 5 and 6, Plaintiff argued that as the requests pertained to car movement records, Defendants' objection that Conrail had not turned over "service and transit time" data, was unresponsive. Plaintiff's Memorandum at 14. Additionally, Plaintiff pointed to Ms. Butler's deposition testimony suggesting Defendants should have access to such information. *Id.*

In opposition to Plaintiff's motion regarding Requests Nos. 5 and 6, Defendants again asserted the while Conrail did provide to Defendants rail car movement records for specific shipments, without more specific rail car identification information, Defendants are unable to locate responsive records. Defendants Memorandum at 8. In reply, Plaintiff reasserted the position taken in support of its motion, that if Defendants are unable to search their records, Plaintiff is prepared to accept in electronic form all of Defendants' records for the requested information responsive to the request, and conduct its own search. Plaintiff's Reply at 3. Based on Plaintiff's contentions and the lack of an factual affidavit by a knowledgeable person, available to the court, more fully supporting Defendants' failure to produce, Defendants' objections were overruled by the court. Amended D & O at 22–23.

In support of their reconsideration motion regarding Plaintiff's Requests Nos. 5 and 6, in their Supplemental Response, Defendants stated that they did not obtain from Conrail responsive records for the relevant period prior to Defendants' acquisition of Conrail assets. Supplemental Response at 4–5. Defendants also acknowledged they had received car movement records but require rail car numbers and shipment dates to ascertain whether responsive records exist as explained in the affidavits of Mr. Heilig and Ms. Butler. *Id.* Regarding Plaintiff's Requests Nos. 5 and 6, Mr. Heilig states, in apparent contradiction to Defendants' initial response, that Defendants had "obtained and/or received railway car movement records *for specific shipments.*" Heilig Affidavit II ¶ 5 (underlining added). The only reference to Request No. 5 in Ms. Butler's affidavit is the inaccurate assertion that Request No. 5 seeks information for the period "when Conrail transported cargo on the routes at issue." However, it is Plaintiff's Request No. *6,* not 5, that seeks information based on Conrail's operations regarding the Defined Routes. Nevertheless, Defendants again contended that to determine whether records responsive to Plaintiff's request presently exist, Defendants require that Plaintiff provide "railway car numbers and dates of shipment." *Id.* Neither Mr. Heilig, Ms. Butler, nor Defendants responded to Plaintiff's alternative request that it be provided with the pertinent records in electronic format in order to facilitate a search for the requested data by Plaintiff.

Plaintiff's Request No. 7 sought documents relating to " 'standards and goals,' 'planned transit time,' service standards, trip plans, car trip plans, car scheduling plans or rules, train blocking plans, service planning documents or car or train scheduling directives for the defined Routes from January 1, 1998 to present." Plaintiff's Exhibit C at 6.

Defendants' response asserted generalized objections and reiterated their response to Request No. 1, *i.e.,* that Defendants do not possess trip plans, service plans, blocking page books, train schedules, transportation service plans or car scheduling dates, six of the sixteen types of documents Plaintiff sought under Request No. 1. Plaintiff's Exhibit E at 5.

In support of its motion to compel, Plaintiff argued the requested documents were relevant and that Ms. Butler had conceded the existence of "planned transit times" as an example of the type of records available to Defendants and responsive to Request No. 7. Plaintiff's Exhibit M at 30–31. Defendants did not specifically oppose Plaintiff's motion as to Request No. 7, rather Defendants relied on their opposition to Plaintiff's Requests Nos. 1 and 2. Defendants' Motion at 5. As the court had overruled Defendants' objections to Request No. 1, the court also rejected Defendants' objections to Request No. 7. Amended D & O at 23. In discussing

Request No. 7, the court noted that in her deposition regarding the availability of "transit times," "Ms. Butler testified she was 'certain' Defendants possessed such records." *Id.*[10]

Plaintiff's Requests Nos. 8 and 9 seek, respectively, Defendants' agreements with Plaintiff's competitors Akzo Nobel and Cargill for transportation services over the Defined Routes, and documents relating to any meetings between Defendants and Akzo Nobel or Cargill. Plaintiff's Exhibit C at 6. Defendants' response to Request No. 8 asserted Defendants' general objections and specifically claimed that the requested documents were *"confidential by their terms."* Plaintiff's Exhibit E at 5. As to Request No. 9, Defendants asserted only their general objections. *Id.* at 6.

In support of its motion to compel, Plaintiff contended that Requests Nos. 8 and 9 sought relevant information on the ground that any "performance" levels of freight service to be provided by Defendants to Plaintiff's competitors for like freight services, *i.e.,* shipments of commercial salt over the Defined Routes, were relevant to Plaintiff's breach of contract and reasonable dispatch claims based on Defendants' alleged failure to provide to Plaintiff such freight services with reasonable dispatch. Plaintiff's Memorandum at 15. Plaintiff asserted a similar argument against Defendants' generalized objections to Plaintiff's Request No. 9. *Id.* at 16.

In opposition to the Plaintiff's motion to compel, Defendants claimed that the requested contracts were confidential, and that they contained no "information about transit times." Defendants' Memorandum at 9. Defendants also maintained that as neither Akzo Nobel nor Cargill shipped salt over the exact same rail routes used by Defendants for Plaintiff's salt, the requested contracts were irrelevant "in any event." *Id.* Defendants did, however, acknowledge that as the competitors' shipments were over routes used by Defendants to ship Plaintiff's products there may be some "partial overlap" between the routes used for Akzo Nobel and Cargill and Plaintiff's shipments. *Id.* How-

ever, no details as to the extent of such "overlap" were provided by Defendants. Defendants' opposition to Plaintiff's motion regarding Plaintiff's Request No. 9 was that the requested documents were irrelevant because of the asserted dissimilarity of routes used for the Akzo Nobel and Cargill shipments, as Defendants contended in opposition to Plaintiff's Request No. 8. Defendants' Memorandum at 10. Defendant further argued that Plaintiff's motion sought information related to "similar routes," a request not explicitly made under Plaintiff's Request No. 9. *Id.*

In its reply, Plaintiff again contended the requested contracts could conceivably have included guaranteed shipment times to Akzo Nobel and Cargill, and that Defendants failed to contradict Plaintiff's counsel's averment that Akzo Nobel "used the same routes as ARC [Plaintiff] because it [Akzo] shipped from the same mine to some of the same stockpiles." Plaintiff's Reply at 3 (referencing Yesawich Affirmation ¶¶ 5–6) (bracketed material added). In accepting Plaintiff's position as to relevancy of the request and noting Defendants had failed to establish any justification for nondisclosure based on protectable proprietary information or that the requests were unduly burdensome, the court overruled Defendants' objections, noting that Defendants do not deny the existence or availability of the requested documents. Amended D & O at 25. However, the court sustained Defendants' objection as to requested records for "similar routes" on the ground that such "similar routes" information was not sufficiently stated in Plaintiff's Requests Nos. 8 and 9. *Id.*

In Defendants' Supplemental Responses to Requests Nos. 8 and 9, Defendants claim, without citation to relevant caselaw under Rule 34(a) or reference to any responsive documents, that Defendants are without "authority" to provide the requested agreements absent a waiver from Akzo Nobel and Cargill. Defendants' Motion at 6. Additionally, Defendants assert the requested contracts as to Conrail services to Akzo Nobel and Cargill are not available to Defendants, and Defen-

---

**10.** In Plaintiff's Request No. 1, Plaintiff sought records of any "analysis of transit times"; in Request No. 7, Plaintiff sought records of "planned transit times."

dants are without authority to "waive Conrail's confidentiality" interests in the contracts. *Id.* Nevertheless, Defendants also stated their willingness to submit the contracts for an *in camera* inspection should the court overrule Defendants' relevancy objections to Requests Nos. 8 and 9. *Id.* at 6–7. No copies of the contracts were submitted to the court for this purpose. Defendants also referred to the affidavits of Mr. Heilig and Mr. Robert J. Plain, Exhibits B and C, respectively, to Defendants' Supplemental Responses.

As relevant, in his affidavit, Mr. Heilig averrs Defendants did not receive from Conrail the requested documents responsive to Requests 8 and 9, nor are such documents "available to them." Heilig Affidavit II, ¶¶ 3, 6. In his affidavit, Mr. Plain, marketing director for Defendant Norfolk Southern Railway, states Defendants have no contracts with Akzo Noble or Cargill for shipments over the routes utilized for Plaintiff's salt product and disclosure of the requested contracts "could be harmful" to Plaintiff's competitors. Plain Affidavit ¶¶ 5–6.

Neither Defendants' Supplemental Response, nor the supporting affidavits, make any attempt to explain why Defendants' later assertion that responsive documents were not received or available to Defendants from Conrail were not stated in Defendants' initial response to Plaintiff's Request Nos. 8 and 9, or in Defendants' opposition to Plaintiff's motion to compel. Nor do Defendants attempt to explain how Defendants became aware of the asserted specific confidentiality provision in contracts between Plaintiff's competitors and Conrail ("defendants have no authority to waive *Conrail's confidentiality* to these contracts)," Supplemental Response at 6 if, as Defendants claim, the relevant contracts with Conrail are available to Defendants ("they [the contracts] were not acquired by nor are they available to defendants ...),", Defendants' Supplemental Response at 6, and that Defendants have no "unilateral" ability to require Conrail to provide documents. *Id.*

In Plaintiff's Interrogatory No. 1, Plaintiff asked Defendants to state the average turn times, *i.e.*, the time required to transport a rail car used by Defendants to transport Plaintiff's products under the contracts at issue from one location to another and return the freight car to the point of origin, for the Defined Routes. Plaintiff's Exhibit D. For their answer, Defendants raised generalized objections and further stated that, because of the array of factors affecting turn times, Defendants did not maintain records of average turn times responsive to the Interrogatory. Plaintiff's Exhibit F at 3. Defendants also represented that where "connecting carriers and/or short lines are involved in a route," Defendants lack access to the relevant turn times, implying without explaining that such connecting carriers or short lines were involved in transporting Plaintiff's salt. *Id.*

In support of its motion to compel as to Plaintiff's Interrogatory No. 1, Plaintiff pointed to evidence, Plaintiff's Exhibit O at 1 (excerpt from Defendant Norfolk Southern's 2001 Annual Report), that Defendants maintain records particularly as to "transit time," from which such turn times could be calculated. Plaintiff's Memorandum at 16. *See also* Plaintiff's Exhibit L at 6 ("Performance is measured by ontime departures at origins, *point-to-point transit times* and on-time arrivals at destinations.") (underlining added); Plaintiff's Memorandum at 16. Defendants also track "cycle times" for some of its service lines. *Id.* at 14. Additionally, according to Plaintiff, Defendants offered to supply car movement records for Plaintiff's cargo for the post-contract period January 2002 to August 2002 from which relevant performance information could be determined by Plaintiff. *Id.* at 17.

In opposition to Plaintiff's motion, Defendants asserted Defendants do not record data for all of its routes from which average turn times responsive to the Interrogatory could be determined. Defendants' Memorandum at 3–4. In its reply, Plaintiff points out that Defendants do not specifically deny that data for the Defined Routes exists. Plaintiff's Reply at 1–2. Plaintiff also objected to Defendants attempt to unilaterally define Plaintiff's request to cover all of the trackage over which Plaintiff's freight may have moved, rather than the portion of the

Defined Routes, including only Defendants' rail lines, used by Defendants to transport Plaintiff's salt. Plaintiff's Reply at 1. Additionally, Plaintiff contended the fact that Defendants asserted there was no need for the requested discovery because Plaintiff's expert ostensibly had access to some of the requested information, rebuts Defendants' assertion of the non-existence or unavailability of the requested records. *Id.* at 1–2.

As to Plaintiff's Interrogatory No. 1 seeking average turn times for the Defined Routes, the court found that Defendants do not specifically deny they maintain records from which average turn times for the relevant routes can be determined and the information sought was relevant. Amended D & O at 9–11. The court therefore overruled Defendants' objections. *Id.*

On Defendants' Motion for Reconsideration, Defendants submitted an affidavit of Mr. Tim Heilig, Defendant Norfolk Southern Corporation's Vice–President of Transportation, explaining that Defendants do not possess any information or documents responsive to Plaintiff's Interrogatory No. 1 because Defendants measure the "time interval between shipment origin and its destination," not car cycle time, *i.e.*, time to destination and return to origin. Heilig Affidavit I, ¶¶ 3–4.

## DISCUSSION

■■■ For a party to prevail on a motion for reconsideration, the party must (1) "present '[factual] matters or controlling decisions the court overlooked that might materially have influenced its earlier decision,'" *Griffin Industries, Inc. v. Petrojam, Ltd.*, 72 F.Supp.2d 365, 368 (S.D.N.Y.1999) (internal citations omitted) or (2) the party "must demonstrate 'the need to correct a clear error or prevent manifest injustice.'" *Id.* "These criteria are strictly construed against the moving party so as to avoid repetitive arguments on issues that have been considered fully by the court." *Id.* (citing *Monaghan v. SZS 33 Associates, LP.*, 153 F.R.D.

60, 65 (S.D.N.Y.1994)). Further, the "motion is not a vehicle for presenting the case under new theories, securing a rehearing on the merits, or otherwise taking 'a second bite at the apple.'" *Id.* (quoting *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir.1998)). Additionally, whether to grant or deny such motions is within the sound discretion of the court. *Id.* (citing cases). *See also Larouche v. Webster*, 975 F.Supp. 490, 492 (S.D.N.Y. 1996) (criteria for motions for reconsideration "strictly construed against moving party") (citing cases).

Here, Defendants claim that they complied with the court's directive at oral argument to submit affidavits to establish that either the information requested was actually unavailable to Defendants or that it would be unduly burdensome to produce responsive documents. Defendants' Memorandum of Law in Support of Reconsideration at 1–2. Defendants, as noted in the Background, *supra*, at 441, obtained affidavits from three officers of Defendant Norfolk Southern Corporation and one officer of Defendant Norfolk Southern Railroad that were served on Plaintiff on April 9, 2003, in which each affiant gave reasons why documents responsive to the Plaintiff's requests, to which the respective affidavits were directed, could not be provided. Defendants' Motion for Reconsideration, Exhibits A—E. At the same time, as described more fully in the Background, *supra*, at 441, Defendants also served Supplemental Responses in an attempt to provide additional reasons to support Defendants' claimed inability to respond. *Id.*, Exhibit 1.

According to Defendants, the affidavits complied with the court's direction that Defendants supply affidavits based on personal knowledge that responsive documents were not available to Defendants or that their production would be unduly burdensome. Minute Entry Doc. No. 46.[11] Plaintiff's counsel, Laura W. Smalley, Esq., stated in her affirmation opposing reconsideration that as she was on maternity leave between March 21, 2003 and July 7, 2003, she has no recollec-

---

**11.** Specifically, the minute entry states Defendants were to provide affidavits with respect to Interrogatory No. 1, and Requests Nos. 1, 2, 3, and 4, Plaintiff was to consider possible withdrawal of its motion upon receipt of such affidavits, and that the court otherwise reserved decision.

tion of receiving Defendants' Supplemental Responses or the related affidavits, except the Butler affidavit (Doc. No. 57) that was handed up to the court at oral argument, and that it was therefore "unlikely" that Smalley had initiated a phone call to Defendants' counsel upon receiving the documents, contrary to Defendants' counsel's recollection. Smalley Affirmation ¶ 4.

Regardless of the attorney's opposing recollections of the specific facts regarding service of the supplemental responses and affidavits, there is no dispute that Defendants did not file copies of these documents with the court. Nor it is disputed that Defendants failed to otherwise advise the court that such documents had been served on Plaintiff and that Plaintiff had indicated, as Mr. Keenan's affidavit asserts, that based on Defendants' Supplemental Responses and the affidavits, Plaintiff's motion to compel was rendered moot. Additionally, Defendants took no further steps to cause the motion to be withdrawn or dismissed by the court based on such asserted mootness. As a result, Plaintiff's motion remained on the court's docket, unresolved, as far as the record reflected. Accordingly, because of the lapse of time, and absent any further communications from the parties regarding the status of the motion, the undersigned's judicial assistant telephoned Plaintiff's counsel to ascertain whether the issues raised by the motion and considered at oral argument had since been resolved by way of further submissions by Defendants as the court had directed. Based on Ms. Smalley's statement to the court's judicial assistant that the issues raised by Plaintiff's motion remained unresolved, the court drafted and filed the Decision and Order and Amended Decision and Order.

While it appears odd that on a matter as important as obtaining a judicial determination on the merits, or a formal withdrawal, of Plaintiff's motion to compel, Defendants would not have also filed with the court the supplemental materials, allegedly served on Plaintiff even absent a formal direction by the court to do so, or at least advised the

court in writing that such supplemental materials had been served and of Plaintiff's response or any lack thereof, nevertheless, that is what apparently occurred here. On the other hand, until the court inquired of Plaintiff as to the status of the matter, neither side had requested the court to proceed to consider Defendants' additional materials and decide the motion, or took any steps to formally withdraw or dismiss the motion as moot. The court also observes that Plaintiff does not dispute receipt of the supplemental materials and Mr. Keenan's transmittal letter dated April 9, 2003,[12] rather, Plaintiff asserts, unspecifically, in opposition to Defendants' motion for reconsideration that the supplemental responses "are still inadequate." Smalley Affirmation ¶ 3. Thus, the court will consider the merits of Plaintiff's motion based on all the submissions, included those served by Defendants following oral argument and included in support of Defendants' Motion for Reconsideration.

Based on its review of Defendants' motion, Plaintiff's opposition thereto, the documents filed in connection with Plaintiff's motion and the court's Amended Decision and Order, the court finds that Defendants' motion does not point to controlling legal precedent or factual matters that the court may have overlooked in reaching its conclusions in the Amended Decision and Order, as Defendants do not rely on any such precedent and the factual materials on which Defendants rely were not submitted to the court prior to the court's decision and therefore could not have been overlooked. *See Griffin, supra.* Thus, if reconsideration should be granted warranting a different result, such determination must be justified by the need to correct a clear error or to avoid manifest injustice. *Id.*

Defendants do not point to any "clear error" in the Amended Decision and Order; rather, any relief Defendants request is based on the premise that because Defendants' Supplemental Responses and related affidavits complied with the court's direction and demonstrate that the requested information is not in Defendants' possession or, as to the requested Conrail records, within Defen-

---

12. The court notes it was not copied on Mr. Keenan's transmittal letter to Ms. Smalley dated

April 9, 2003, attached to Defendants' Reply Brief (Doc. No. 66).

dants' possession or control, the failure to deny Plaintiff's motion would result in manifest injustice to Defendants. In the absence of any particularized analysis by Plaintiff of the deficiencies Plaintiff attributes to Defendants' Supplemental Responses and affidavits, the court turns to a consideration of each of Defendants' Supplemental Responses and the corresponding affidavits.

*Plaintiff's Interrogatory No. 1.*

In this Interrogatory, Plaintiff sought average turn times, *i.e.*, the elapsed time to and from a destination, for freight service, including return of Plaintiff's freight cars, provided by Defendants over the Defined Routes. Defendants' initial response was that average turn times were not recorded by Defendants, actual turn times resulted from numerous factors, and the basic information required to compute a turn time was not necessarily available to Defendants. Amended D & O at 8–9. In rejecting the Defendants' objection to Interrogatory No. 1, the court found that evidence, including references to statements about Defendants' services published in Defendants' annual reports, submitted by Plaintiff in support of the motion, supported an inference that recorded information, from which average turn times responsive to Interrogatory No. 1 could be determined, was available to Defendant. Amended D & O at 8–11. Significantly, Defendants have at no time in opposition to Plaintiff's motion, in Defendants' Supplemental Responses, or in the related affidavits, made any attempt to rebut Plaintiff's or the court's reliance on such evidence. Further, Ms. Butler's affidavit, Doc. No. 57, while contending that many of the numerous variables affecting "turn or cycle time" [13] are not controlled by Defendants, did not specifically negate the existence and availability to Defendants of turn or cycle time information responding to the Interrogatory. Amended D & O at 11. For these reasons, the court directed Defendants to answer Plaintiff's Interrogatory No. 1, or provide Plaintiff access to Defendants' records from which average turn times may be calculated. *Id.*

In Defendants' motion for reconsideration, Defendants submitted Mr. Heilig's Affidavit stating, on personal knowledge, that Defendants possess no information "specifically responsive to Interrogatory No. 1 and Requests Nos. 1 and 7." Heilig Affidavit I, ¶ 3. However, in response to Plaintiff's Request No. 1, seeking several categories of documents pertaining to Defendants' freight services over the Defined Routes, Plaintiff specifically requested, *inter alia*, "documents which relate to or comprise any ... *turn times or cycle times* ...," Plaintiff's Exhibit C at 4, 6 (underlining added), Defendants did not deny the existence of the requested records pertaining to turn times or cycle times. Specifically, Defendants stated that "STB [Surface Transportation and Conrail Transportation Council] report *may contain aggregated cycle times information for the defined Routes.*" Defendants' Memorandum of Law at 4. Defendants further asserted, however, that as the information was not route specific, and did not distinguish among cars based on type of cargo, the information was irrelevant. *Id.* at 4–5. Defendants reiterated this position in Defendants' Supplemental Response. Defendants' Motion for Reconsideration, Exhibit I, at 2–3. Significantly, neither in its opposition to Plaintiff's motion, its Supplemental Responses, nor in Mr. Heilig's affidavit, Heilig Affidavit I, do Defendants explain how the requested "turn time or cycle time" information for the Defined Routes can exist in "aggregated" form, but not in a more detailed or basis form from which the "aggregated" form is, according to Defendants, derived and reported to the Surface Transportation Board and the Conrail Transportation Council.

In any event, "aggregated" turn or cycle time information or records are reasonably within Plaintiff's Request No. 1 for "documents *which relate to* or comprise ... turn times or cycle times ...." Plaintiff's Exhibit D at 4. Mr. Heilig's generalized averment that Defendants "do not maintain or possess *any* information or documents specifically responsive to Interrogatory No. 1," (underlin-

---

**13.** In her first affidavit submitted to the court at oral argument by Defendants (Doc. No. 57) Ms. Butler noted that "turn times" and "cycle times" were equivalent terms. Butler Affidavit, dated February 4, 2003 (Doc. No. 57) at ¶ 5.

ing added) is therefore inconsistent with Defendants' prior representation and, in failing to address whether Defendants' reports to the Surface Transportation Board and Conrail Transportation Council in fact contain such responsive information, or the predicate data upon which the "aggregated" information is based, avoids the question thereby undermining its credibility. The same may be said for the assertions in Ms. Butler's affidavit. Significantly, neither Heilig nor Butler suggest that production of the "aggregated" information would be burdensome as Defendants had stated in their initial objection. Therefore, the court finds that adhering to its decision to grant Plaintiff's motion as to Interrogatory No. 1 does not overlook undisputed facts and will not result in a miscarriage of justice. Accordingly, Defendants' motion for reconsideration as to Plaintiff's Interrogatory No. 1 is DENIED.

*Plaintiff's Requests Nos. 1 and 2.*

As explained, Fact statement, *supra,* at 6–8, Plaintiff's Request No. 1 seeks various documents pertaining to rail freight service provided by Defendants and Conrail over the Defined Routes. Plaintiff's Request No. 2 seeks similar Conrail documents. While Defendants denied possession of trip plans, services plans, blocking page books, train schedules, transportation service plans or car scheduling data responsive to Plaintiff's request, no similar denial was interposed regarding the remaining nine categories of described documents covered by the requests. In their Supplemental Responses, Defendants stated that Defendants possess no responsive documents for the period June 1, 1999 through September 1, 2000. Further, Defendants asserted that while Defendants may possess "preacquisition Conrail Schedules and STB Reports" such documents present "aggregated information" and not information specific to the defined Routes. Defendants also contended that as Conrail continues to operate as a separate entity, the requested Conrail documents are not available to them. As discussed in regard to Defendants' objection to Plaintiff's Interrogatory No. 1, Discussion, *supra,* at 29–31, Mr. Heilig averred Defendants do not maintain or possess information or documents responsive to Plaintiff's Request No. 1, and that, as to Plaintiff's Request No. 2, Defendants did not receive any responsive documents from Conrail. Heilig Affidavit I, ¶ 3; Heilig Affidavit II, ¶ 3.[14] However, Heilig did acknowledge Defendants possessed Surface Transit Board (STB) and Conrail Transportation Council reports that may contain responsive information as to Conrail operations in "aggregated form." Affidavit II, ¶ 4. Heilig also acknowledged Defendant "may have obtained" ... ' Conrail trip plans, but these plans were overwritten as new plans were developed," and that Defendants did not receive Conrail "data regarding service and transit times for the defined Routes." Heilig Affidavit II, ¶ 4.

Unfortunately, neither Heilig nor Defendants explain whether any search of Defendants' records was in fact conducted to ascertain whether Conrail trip plans to which Mr. Heilig referred were received by Defendants from Conrail so as to clarify exactly what Defendants mean by their use of the phrase "*may* have obtained." *Id.* (underlining add-

---

**14.** In Defendants' motion, Defendants' attorney asserted in an unsworn statement that "[f]ollowing oral argument on Plaintiff's motion to compel Defendants undertook a thorough and intensive investigation as to whether Defendants had access to the requested documents or other responsive information." Defendants' Motion ¶ 5. However, in none of the affidavits submitted in support of Defendants' motion for reconsideration make any attempts to confirm counsel's representation as to the extensiveness or thoroughness of such investigations. Defendants' continued failure to provide such confirmation is surprising considering that the need for an affidavit by a corporate official with knowledge of Defendants' records who had personally conducted such a good faith search was precisely the type of affidavit the court requested when it extended to Defendants the opportunity to supplement its opposition to Plaintiff's motion to compel by providing such affidavit(s). Moreover, at the risk of being accused of quibbling, the court notes that Mr. Heilig's averment that he has "personal knowledge of ... the documents sought" by Plaintiff can be taken to mean Heilig has had physical access to the documents, a fact inconsistent with Defendants' prior responses. In any event, even allowing for its ambiguity, such assertion does not necessarily mean Heilig personally conducted a search of Defendants' records to determine whether responsive documents were among Defendants' records.

ed). Moreover, Mr. Heilig fails to explain how records that *may* have been obtained "were overwritten," thus strongly implying that the records were in fact received. Otherwise, how could it be determined that the original records in whatever form were "overwritten" as Heilig asserts? Moreover, how such records could physically be "overwritten" is also not explained by Heilig, nor is there any explanation as to whether the underlying data, relevant to trip plans, exists in a retrievable electronic form that remains available to Defendants for production to Plaintiff.

Additionally, as noted, Plaintiff's requests seek transit time information ("analyses of transit time"), or the "time interval between shipment origin and its destination." Heilig Affidavit I, ¶ 4. Defendants have never stated they lack transit time records pertaining to the Defined Routes. *See* Defendants' Responses to Plaintiff's Requests Nos. 1 and 2, *passim.* For example, the court noted that in response to the question whether Defendants "have planned *transit times* for those [the other Defined] routes?," Ms. Butler testified "I'm certain that they did." Amended D & O at 15–16, Plaintiff's Exhibit M at 30–31. Additionally, Defendants' responses fail to specifically state that documents constituting "service measurements, analysis of transit times, service consistency levels, service problems, traffic volumes, train and car velocities, turn times or cycle times" for the Defined Routes are unavailable to Defendants. In her deposition, Ms. Butler testified she could not say whether planned transit times for the Defined Routes remained available to Defendant Norfolk Southern Railway in its "ITMS system." Defendants' Memorandum at 5–6. Defendants' Supplemental Responses shed no additional light on this question. Nor does Mr. Heilig's affidavit address this question, except to aver that Defendants have not received "data regarding service and transit times for the defined Routes," Heilig Affidavit II, ¶ 3, from Conrail

suggesting that such data may exist with Conrail. Heilig's affidavits also fail to rebut the court's evaluation of the evidence in the record, testimonial and documentary, provided by Plaintiff upon which the court found a reasonable basis to believe, that following Defendants' acquisition of Conrail assets, Defendants had access to train scheduling information for prior Conrail operations. Amended D & O at 14–15.

In the Amended Decision and Order, the court also reviewed other evidence persuasively demonstrating Defendants' access to blocking data responsive to Requests Nos. 1 and 2. Specifically, the court noted that Defendants admitted that Conrail documents responsive to Plaintiff's requests Nos. 1 and 2 may still be available. Amended D & O at 14 (referring to Plaintiff's Memorandum at 8 and Plaintiff's Exhibit G).[15]

The court also pointed to statements in Defendants' 1998 Annual Report (Plaintiff's Exhibit H at 3) pointedly representing that, prior to completion of the acquisition in June 1999, Defendants had prior access to Conrail blocking records. Amended D & O at 5. Specifically, the Norfolk Southern Corporation's 1998 Annual Report states that the "enormity of the task [of integrating Conrail's lines into Defendant Norfolk Southern Rail's system] was *most* apparent when [Norfolk Southern's] team began to review Conrail's tables of '*block definitions*' which are *detailed* rules about groups of rail traffic carried on trains." Plaintiff's Exhibit H at 3 (bracketed material added) (underlining added). Describing Defendants' reliance on Conrail management to enable Defendants to successfully integrate into Norfolk Southern Railway's system Conrail assets and operating procedures, Mr. David Dufner, Norfolk Southern Railway's manager for Central Yard Operations stated in the Annual Report that "[w]e [Conrail and Norfolk Southern Railway] worked hand-in-hand all the way."

---

**15.** Exhibit G is a copy of an August 6, 1997 Surface Transportation Board Directive calling upon Norfolk Southern Corporation and CSX Transportation to provide projected train schedules for their respective systems including the acquired Conrail routes as a precondition to the Board's approval of the proposed acquisition of Conrail assets, which became effective June 1, 1999. As such, it is reasonable to infer that Defendants have access to the schedules provided to the Board for Defendants' rail service on the Defined Routes during the post June 1999 contract period.

*Id.* at 5 (bracketed material added). Such published statements therefore cast doubt on the accuracy of Mr. Heilig's broad assertion, that neither Defendant "obtained or received Conrail data regarding service and transit times for the defined Routes," Heilig Affidavit II, ¶ 4. It is therefore not credible that in "working hand-in-hand" with Conrail employees to effect a successful merger of this complexity, Defendants did not have access to a wide range of Conrail's operational records, including those responsive to Plaintiff's Requests Nos. 1 and 7.

In Defendants' 2001 Annual Report, Defendants highlighted improvements that Defendants achieved following merger of the Conrail properties in terminal dwell time and average train speed compared to "pre-Conrail [merger] levels." Plaintiff's Exhibit L at 8 (bracketed material added). Manifestly, without access to pre-acquisition Conrail records, and comparable Conrail data, such asserted improvements could not have been measured by Defendants.

Further difficulty with Mr. Heilig's apparent overstatement is demonstrated by the 2001 Annual Report's admission that in operating Conrail's lines in Defendants' Northern Region, Defendant Norfolk Southern Railway, following acquisition of Conrail properties under lease agreements with Conrail Inc.'s subsidiary, CRC, under which Defendants operated former Pennsylvania Railroad lines that were merged into CRC and Conrail, Inc. in 1976, Defendants experienced "system congestion," resulting in increased "cars on line," "terminal dwell times," and "reduced system velocity." Plaintiff's Exhibit L at 18. Nor do Mr. Heilig's affidavits rebut the court's observation, Amended D & O at 18–19, that the ability of Defendants to accurately measure improvements in Defendants' freight service system, presumably including transit times for the Defined Routes, compared to similar performance measures for 2000, required access to Conrail records. However, in neither its Supplemental Responses nor the affidavits submitted by Defendants is there any demonstration as to how the court's analysis in the Amended Decision and Order failed to consider important facts then available to the court on this issue, or that adhering to the court's original determination would result in manifest injustice to Defendants.

Finally, although not specifically discussed in the Amended Decision and Order, careful review of Plaintiff's Exhibit L, Norfolk Southern Corporation's Annual Report for 200,1 reveals that Defendants realized for at least one service that "a 50% improvement *in cycle times* . . . enabled NS to handle the same amount of traffic with 200 fewer cars." Plaintiff's Exhibit L at 14 (underlining added). Such a representation, that Defendants can and do track "cycle times," as made in Defendant Norfolk Southern's Annual Report contradicts Ms. Butler's general assertions that Defendants do not possess "*any* information . . . specifically responsive . . . to Interrogatory No. 1," requesting average turn or cycle times (underlining added). Butler Affidavit, ¶ 3 and Mr. Heilig's averment that "NS *does not track rail car cycle time* . . . ." Heilig Affidavit I, ¶ 4 (underlining added). Further, in the same annual report, Norfolk Southern Corporation acknowledged that after June 1999 Defendant Norfolk Southern Railway's "operation of Conrail's properties," resulted in "system congestion, and, *'reduced system velocity.'*" Plaintiff's Exhibit L at 18 (underlining added). As noted, Plaintiff's Request No. 1 specifically requested documents relating to "service measurements, analyses of transit times, service consistency levels, service problems, traffic volumes, *train or car velocities,* turn times or cycle times." Defendants have not asserted such records are not available for production, and the existence of responsive documents is confirmed by Defendants' statement in its 2001 Annual Report in regard to such "system congestion," "cycle times," and "train or car velocities." Plaintiff's Exhibit L at 18. It is self-evident that Defendants must have had access to records or data for both Defendants' and Conrail's upon which to base such disclosures. As discussed, Discussion, *supra,* at 455–56, these published statements by Defendants are directly at odds with Mr. Heilig's affidavits asserting Defendants' lack of documents "specifically" responsive to Plaintiff's requests Nos. 1, 2, 4, 7, 8, and 9. Heilig Affidavit I, ¶ 3; Heilig Affidavit II, ¶ 3.

As to Request No. 2, Defendants, in their Supplemental Responses, state that as Defendants have "no legal or practical control or influence" over Conrail, responsive documents are neither subject to Defendants' control nor available to Defendants. Defendants' Supplemental Responses at 3. Additionally, Dezora Martin's affidavit asserts that although Conrail is, through a holding company, jointly owned by Defendant Norfolk Southern Corporation and CSX Transportation Corporation, Conrail remains a separate entity, and neither Defendant can unilaterally control Conrail operations including directing Conrail employees to provide requested discovery to Plaintiff, as to preacquisition Conrail records. Martin Affidavit, ¶ ¶ 4, 6–8.

■ Fed.R.Civ.P. 34(a) requires production of relevant documents within a party's "possession, custody or control," if relevant and not privileged, responsive to another party's request. Documents of a wholly owned subsidiary have been held to be subject to Rule 34 document requests served upon a corporate parent which is a party to the litigation. *Novartis Pharmaceuticals Corp. v. Eon Labs Mfg., Inc.*, 206 F.R.D. 392, 395 (D.Del.2002) (citing *Pennwalt Corp. v. Plough, Inc.*, 85 F.R.D. 257, 263 (D.Del. 1979)). *Id.* In addressing a requested party's claim that documents subject to production pursuant to Fed.R.Civ.P. 34 no longer exist or are then in the physical possession of a third person not controlled by the requested party " 'without that party's complicity," ' courts are to "closely examine the actual relationship between two corporations and guard against fraud and deceit, but also sharp practices, inequitable conduct or other false or misleading actions whereby corporations try to hide documents or make discovery of them difficult." *Uniden America Corporation v. Ericsson Inc.*, 181 F.R.D. 302, 306 (M.D.N.C.1998) (corporation found in control of documents of sister corporation for Rule 34 purposes) (quoting *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 204, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958)).

■ Under "this broad construction of Rule 34," several types of business relationships have been held sufficient to constitute the requisite degree of control including where one party has the legal right to obtain access to the requested records from a nonparty or has contractually agreed to assist the other party in litigation, when the parties' history, association, assignments and transactions together show sufficient mutuality, and when a non-party agrees to produce documents at the request of a party. *Uniden America Corporation, supra*, at 306, n. 7 (citations omitted). Courts also consider "whether the litigant corporation could secure materials from the non-party corporation to meets it own business needs, and whether, by virtue of stock ownership or otherwise, one corporation effectively controls the other." 8A Charles Alan Wright, Arthur R. Miller, Richard L. Marcus, FEDERAL PRACTICE AND PROCEDURE, CIVIL § 2210 (2d ed.2004). Additionally, documents held by party's agent are deemed to be in a party's control. Steven Baicker–McKee, William M. Janssen, John B. Corr, FEDERAL CIVIL RULES HANDBOOK (2005) at 686 (citing *United States ex rel. Stewart v. Louisiana Clinic*, 2003 WL 21283944 *12 (E.D.La. June 4, 2003) (citing *Poole ex rel. Elliott v. Textron, Inc.*, 192 F.R.D. 494, 501 (D.Md.2000))).

■ Factors upon which the court may find actual or "inferred" control, including "complicity" in storing or withholding documents include "commonality of ownership," exchange or intermingling of directors, officers or employees of the two corporations, exchange of documents between the corporations in ordinary course of business, *First Nat. City Bank of N.Y. v. I.R.S.*, 271 F.2d 616, 618 (2d Cir.1959), *cert. denied*, 361 U.S. 948, 80 S.Ct. 402, 4 L.Ed.2d 381 (1960), and involvement of the non-party in the litigation. *Uniden America Corporation, supra*, 181 F.R.D. at 306–07 (citations omitted).

■ In this case, evidence in the record and available on Conrail Inc.'s public website, and Norfolk Southern Corporation's recent filings with the Securities and Exchange Commission ("SEC") of which the court takes judicial notice pursuant to Fed. R.Evid. 201(b)(2), (court may take judicial notice of facts "capable of accurate and ready

determination" from "sources whose accuracy cannot reasonably be questioned"), support a finding that Defendants have both legal and practical control over Conrail's records for the purposes of enforcing Plaintiff's Requests Nos 2, 4, 6, 7, 8 and 9. First, an excerpt from Defendant Norfolk Southern Railway's Operating Plan, filed after Defendants' acquisition and merger of Conrail assets in 1997, ("the Plan") and submitted to the SEC, based on studies conducted by Norfolk Southern Corporation following its acquisition of Conrail assets, Plaintiff's Exhibit K, reveals numerous examples of Defendants' access to Conrail records. Specifically, in the Plan Defendants noted that "Conrail operating practice" concentrated classification activities at several major hub yards. Plaintiff's Exhibit K at 1–2. Second, the Plan states that "[rail] traffic studies indicate that there is sufficient traffic to eliminate the current interchange with Conrail at Cincinnati . . . ." *Id.* at 4. Third, at page 5, the Plan describes planned improvements to Defendant Norfolk Southern Railway's Coal Network through *"elimination of circuitry for coal traffic originating at Conrail mines in West Virginia." Id.* at 5 (underlining added). Fourth, the Plan states that Defendant Norfolk Southern Railway "contemplates the upgrading of Conrail's Southern Tier line between Buffalo, N.Y. and Croxton, NJ as a principal artery for double stack service . . . ." *Id.* at 6. Fifth, referring to the Defendants' "The Triple Crown Network," the Plan states that "NS and Conrail already operate trains for an integrated Triple Crown RoadRailer system," and that "[t]he restructuring of Conrail and division of its routes will require certain changes in current operations on both NS and Conrail . . . open[ing] up some new markets—markets that Conrail was reluctant to pursue because its rail hauls for Triple Crown were often very short." *Id.* at 7. Sixth, the Plan projects specific reductions in actual Conrail transit times on four Conrail routes as a result of the planned integration of Conrail's assets into Norfolk Southern Railway's system. *Id.* at 9–10. Finally, the Plan states that Defendants expect to invest $32 million to bring "curve rail 'on Conrail's lines up to NS standards.' " *Id.* at 11.

In each instance, it is apparent that to enable Defendant Norfolk Southern Railway, a wholly owned subsidiary of Defendant Norfolk Southern, to conduct the evaluation of Conrail's yards, routes, track condition, and transit times to enable Defendants to create and file, with a public agency, a plan for specific improved operations of Defendants' rail service over the rail systems resulting from the combined Conrail and Norfolk Southern Railway lines, Defendants must, in the ordinary course of business, have had access to fairly detailed records maintained by Conrail regarding its general railroad operations, including the Defined Routes, during the period covered by Plaintiff's Request No. 2. Nothing in Defendants' Supplemental Response, or the related affidavits, negates this conclusion. For example, Defendants do not explain how Defendants could estimate reductions in actual Conrail transit times for specified Conrail routes, acquired by Norfolk Southern Corporation, without access to Conrail records, or accurately budget $32 million for required upgrades to particular types of Conrail trackage without having access to detailed Conrail records pertaining to these subjects. Defendants responses, Supplemental Responses, and affidavits provide no plausible explanation consistent with Defendants' representation that Defendants lack access to such responsive records in Conrail's possession to negate the court's conclusion.

Additionally, Defendant Norfolk Southern Corporation's 2001 Annual Report, Plaintiff's Exhibit L, a consolidated financial statement including financial operations of Norfolk Southern's subsidiaries, contains detailed Conrail financial results of operations, including explanatory notes relating to improvements to Defendants' net income resulting from improved casualty and claims experience, tax reserve adjustments and favorable environmental settlements. Plaintiff's Exhibit L at 28. The 2001 Annual Report also states that Conrail is not a publicly registered company thus implying that absent Defendant Norfolk Southern Corporation control over Conrail's operations, based on its 58 percent economic ownership interest in Conrail, and its ownership of 50 percent of Conrail's stock, *id.* at 36, such financial infor-

mation and supporting records would not be readily available to Defendant Norfolk Southern Corporation for inclusion in its financial statements for 2001.

Moreover, because Defendant Norfolk Southern Corporation is a public company, its financial statements must, by law, include financial information for any majority owned subsidiary. Securities and Exchange Commission Rule S–X, Rule 3A–02, 17 C.F.R. § 210.3A–02(a) (majority owned subsidiary's financial information to be consolidated into registrant's financial statement; lack of technical majority ownership irrelevant if lack of consolidation will not fairly present financial position and results of registrant owner.) Indeed, Defendants' 2001 Annual Report states Defendant Norfolk Southern Railway now employs "the majority of Conrail's former work force," and that Defendant Norfolk Southern Corporation provides, for a fee, general and administrative support function to CRC, Conrail's subsidiary. Plaintiff's Exhibit L at 38. Significantly, Norfolk Southern Corporation acknowledges that its 2001 financial statements are consolidated and include Conrail's financial results, Plaintiff's Exhibit L at 36, that such consolidated financial results include those of Norfolk Southern's "majority owned and controlled subsidiaries," and that Norfolk Southern is an "indirect owner [ ] of Conrail." *Id.*

According to Conrail Inc.'s current website, *http://www.conrail.com/.* Conrail, Inc. in describing its corporate history, states that as a result of the 1997 acquisition and merger by Defendant Norfolk Southern and CSX Transportation Corporation, Conrail was "restructured . . . into a switching and terminal railroad that operates *as an agent* for its owners." *http://www.conrail.com/history.htm* (underlying added). Significantly, the website refers new customers to "visit the customer pages of our parent companies, CSX Transportation or Norfolk Southern." *Id.*

Additionally, according Defendant Norfolk Southern Corporation's 2004 Annual Report on SEC Form 10–K, as a result of a corporate reorganization of Conrail by Norfolk Southern Corporation and CSX Transportation, Norfolk Southern became the owner, by merger, of Pennsylvania Lines LLC (the former Pennsylvania Railroad). Norfolk Southern Annual Report, Form 10K, for year end December 31, 2004, at K3. Specifically, under the reorganization, operating leases between Norfolk Southern Corporation and CSX Transportation and Pennsylvania Lines, LLC, and New York Central Lines, LLC, CRC's subsidiaries, were merged into Norfolk Southern Corporation and CSX Transportation, respectively. *Id.* Additionally, as a result of the 1997 acquisition of Conrail assets, Norfolk Southern gained the operating control, through its subsidiary, Defendant Norfolk Southern Railroad, of the Pennsylvania Rail Line LLC routes, and CSX Transportation gained control of the New York Central Lines. Norfolk Southern 2001 Annual Report, Plaintiff's Exhibit L at 18. As it is undisputed that Plaintiff's contract for rail service, prior to June 1997, was with Conrail (specifically, CRC), and it is also undisputed that Plaintiff's contract with Defendant Norfolk Southern Rail was for similar, if not identical, rail freight service over the same Conrail lines, it follows that as a result of the August 2004 reorganization of CRC, Defendants gained ownership and legal control over Pennsylvania Lines, LLC and its assets used to provide the Conrail rail service to Plaintiff prior to the 1997 acquisition.

Although Ms. Martin's affidavit of March 2003, preceded the reorganization by approximately 17 months, and Defendants' motion for reconsideration which included the Martin Affidavit in support of reconsideration was filed August 30, 2004, one week prior to completion of the reorganization, it is remarkable that neither Defendants, Ms. Martin, Mr. Heilig, nor Defendants' attorney realized, or were informed by Defendants, before filing the instant motion, that a major transaction involving Defendants and Conrail was about to render their representations and averments denying control over responsive Conrail records inaccurate, if not materially misleading.

Moreover, pursuant to Fed.R.Civ.P. 26(e)(2) Defendants are charged with the "duty seasonably to amend a prior response to . . . [a] request for production . . . if the party learns that the response is in some material respect incomplete or incorrect

. . . ." However, to date, Defendants have filed no supplementation to their Supplemental Responses to reflect the August 2004 reorganization of Conrail and its effect on Defendants' representation and affidavits and the merits of Defendants' motion. The court therefore concludes Defendants intended that the court act on Defendants' motion for reconsideration, in particular in regard to Plaintiff's several requests for Conrail records, based on their repeated representations that Defendants "do not legally or practically unilaterally control the functions and affairs of Conrail," a proposition now rendered highly inaccurate by the August 2004 reorganization of Conrail by Norfolk Southern and CSX Transportation. As CRC remains as Norfolk Southern's and CSX Transportation's agent, as a separate corporate entity, and the owner and operator of the so-called shared Asset Areas, Conrail website, *supra,* at 2; Norfolk Southern 2004 10K, at K 3, Martin's characterization of the relationship between Defendants and Conrail, as reorganized, may well be technically correct; however, based on the indisputable evidence in the record, particularly the major effect of the August 2004 reorganization upon that relationship, such representations are irrelevant to the issues before the court on Defendants' motion.

Additionally, the court notes that although Heilig's affidavits broadly assert that Defendants have not received responsive documents from Conrail, the affidavits fail to state whether Defendants made any attempt to request such documents, at least to ascertain their availability and whether Conrail would voluntarily provide them for discovery purposes in this litigation. Ms. Martin's averment that Defendants "do not legally or practically *unilaterally* control the functions and affairs of Conrail," Martin Affidavit ¶ 7, frames the question in overly narrow terms.[16] The question before the court, and upon which the court requested, but never received until Defendants' motion was filed, affidavits to support Defendants' objections is not whether Defendants "unilaterally con-

trol the functions and affairs of Conrail," but whether, for purposes of Rule 34(a), Defendants have a practical or legal right to the requested documents in the hands of Conrail and as requested by Plaintiffs. Moreover, Defendants fail to state whether CSX Transportation, Conrail's co-owner, objected or refused cooperation in any attempt by Defendants to obtain responsive documents for this case, or is likely to do so. *See Prokosch v. Catalina Lighting, Inc.,* 193 F.R.D. 633, 636 (D.Minn.2000) (production of documents not in party's possession is required if party has practical ability to obtain the documents from another, irrespective of party's legal entitlement to the documents). "Specifically, control [for Rule 34(a) purposes] is defined as 'the legal right, authority, *or ability to obtain upon demand* documents in the possession of another.'" *Id.* (quoting *Florentia Contracting Corp. v. Resolution Trust Corp.,* 1993 WL 127187 *3 (S.D.N.Y. April 22, 1993)).

Thus, taken as a whole, the record before the court, including Defendant Norfolk Southern Corporation's public statements and annual reports, as discussed, Discussion, *supra,* at 455–56, and in the Amended Decision and Order, Amended D & O at 14–19, establish Defendants have access not only to Conrail's financial information, but also records and data relating to Conrail's system operations, including those of Pennsylvania Lines, LLC, the CRC subsidiary that provided service to Plaintiff prior to the 1999 acquisition, and Conrail's public representation that (prior to August 2004), it functioned as Defendants' agent in the delivery of railroad transportation services, demonstrates that Defendant Norfolk Southern Corporation should be deemed to have control, for purposes of Rule 34(a), over documents and records in Conrail's possession responsive to Plaintiff's Request No. 2. "In parent-subsidiary situations, court have looked to . . . whether the litigant corporation [Norfolk Southern Corporation] could secure materials from the nonparty corporation [Conrail] to meet its [Norfolk Southern] own business

---

**16.** Martin's statement that because of the 50–50 ownership arrangement of Conrail between Norfolk Southern and CSX Transportation requiring the unanimity for directors' actions, a veritable *liberum veto,* while interesting is, for the reasons discussed, *supra,* irrelevant as directors' action is not likely to be required to authorize responses to valid discovery requests in a pending civil action against Conrail.

needs, and *whether, by virtue of stock owner-ship or otherwise,* one corporation effectively controls the other." 8A WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE, CIVIL (2d ed.2004) § 2210 (bracketed material added) (underlining added).

To assert otherwise, as Defendants do in their objections to Plaintiff's Request No. 2, their opposition to Plaintiff's motion to compel, and their motion for reconsideration blinks, the reality of Defendant Norfolk Southern's voting control (together with CSX Transportation), 58% "economic ownership," Norfolk Southern's own decision that to comply with SEC Rule S–X, it was necessary to treat Conrail as a "majority" owned and controlled subsidiary, the plethora of examples showing Defendants' access to Conrail's internal operating records to meet Defendants' every day business needs, the agency relationship between Conrail and Defendants, and the commingling of Conrail's employees and Defendant Norfolk Southern Railway's employees immediately following the 1997 acquisition. *See, e.g., Cooper Industries, Inc. v. British Aerospace, Inc.,* 102 F.R.D. 918, 919–20 (S.D.N.Y.1984) (defendant's relationship to affiliated corporation and its access to documents for defendant's "usual business" needs supported finding that documents were within defendant's control.) (Edelstein, J.). *See also United States ex rel. Stewart, supra,* at *12 ("[a]ctual possession is not the key, . . . rather it is the practical ability to obtain records [be defendant physician from their clinic] the governs Rule 34 requests"); *Prokosch, supra,* at 636.

Significantly, neither Heilig nor Martin explain whether pursuant to the 1999 acquisition, by which Conrail assets were acquired by CSX and Norfolk Southern, the parent corporations are required to cooperate in the production of Conrail records relevant to litigation involving either company, and Defendants' insistence that Conrail exists and operates independently of Defendants therefore exalts form over substance. The reality is that, even before the August 2004 reorganization of Conrail by Norfolk Southern Corporation and CSX Transportation, Defendants and CSX Transportation effectively owned and controlled Conrail having each absorbed

and taken control of Conrail's primary railroad system assets and business, including those used by Defendants to provide the contract services at issue in this case. Moreover, the business relationship at issue commenced with Plaintiff and Conrail, and Defendants effectively stepped into Conrail's shoes when the transportation contract between the parties at issue was entered into in June 1999. On this record, Defendants cannot gainsay they effectively control Conrail sufficient to respond to Plaintiff's request.

Accordingly, the court rejects Defendants' request for reconsideration of the Amended Decision and Order based on Defendants' representations and contentions as provided in Defendants' Supplemental Responses and affidavits submitted in support, and finds that adhering to the Amended Decision and Order directing Defendants respond to Plaintiff's Request No. 2 will not result in a clear error or manifest injustice to Defendants. Defendants' motion for reconsideration as to Plaintiff's Request No. 2 is therefore DENIED.

*Plaintiff's Request No. 3.*

In this request, Plaintiff seeks production of Defendants' reports, studies or analyses, including marketing reports, service reports, service indicators, service interruption reports and customer service complaints or analyses of service levels for rail freight traffic over the Defined Routes. Defendants interposed generalized objections and represented that all relevant documents had been produced. The court overruled each of Defendants' objections. Amended D & O at 19–20.

In support of reconsideration, Defendants reassert that all responsive documents have been produced, in particular, Plaintiff's service complaints. Defendants' Supplemental Response at 3–4; Defendants' Memorandum of Law at 6–7. Additionally, Deborah Butler averred in her affidavit that to the extent responsive documents were available they were made available to Defendants' attorney for production to Plaintiff. Butler Affidavit ¶ 5. However, Defendant Norfolk Southern's Annual Report for 2001 states that operating results for 1999 (and 2000) declined because of "difficulties encountered in the assimila-

tion of the Northern Region [Conrail's former system] into NSR's [Norfolk Southern Railway] existing system that *resulted in* system *congestion,* an increase in cars on line, increased terminal dwell time and *reduced system velocity* [rail speeds] .... [R]evenues were *lower than expected* as *some customers diverted traffic* to other modes of transportation." Plaintiff's Exhibit L at 18 (underlining added).

Thus, Defendants acknowledge that following Defendants' acquisition in June 1999, the start of Plaintiff's contract term with Defendants, of Conrail assets, Defendants' rail services experienced increased delay in delivery time resulting in customer dissatisfaction with Defendants' rail service on former Conrail routes sending freight deliveries to competing common carriers. While not specific to the Defined Routes, Defendants' recognition of deteriorating service, during the same period Defendants were providing service to Plaintiff, makes it is difficult to believe, for reasons not explained by Defendants, that Defendants' capacity to detect, remedy and report on such service problems was not based on data, information or records falling within the scope of Plaintiff's Request No. 3. It is equally implausible that, given the apparent extent of service problems experienced by Defendants, of all Defendants' customers whose freight transportation arrangements with Defendants required, like Plaintiff, transit over the Defined Routes, that only Plaintiff complained about the congestion and delay attributable to Defendants' Conrail acquisition, as acknowledged by Defendants, particularly in the face of Defendant's admission that the "congestion" on Defendants' "system" was so severe as to cause customers to seek out alternative (and presumably competing) modes of transportation warranting disclosure in Defendant Norfolk Southern Corporation's 2001 Annual Report.

Accordingly, the court does not credit Ms. Butler's carefully hedged statement that "to the extent NS [Norfolk Southern Corporation] possess [sic] the documents requested .. I am certain they have been made available ... for production." Butler Affidavit ¶ 5. Such averment directly confirms neither the existence and retrieval of records by Defendants specifically responsive to Request No. 3, nor that all such records were delivered to Defendants' attorneys, and that the records were ultimately served on Plaintiff, a fact Plaintiff has continuously denied. The court therefore finds that Defendants have failed credibly to establish the non-existence of the documents responsive to Request No. 3, and that no miscarriage of justice will arise because of the court's rejection of Defendants' motion as Plaintiff's Request No. 3. Defendants' motion for reconsideration to Plaintiff's Request No. 3 is therefore DENIED.

*Plaintiff's Request No. 4.*

Plaintiff's Request No. 4 seeks documents as described in Request No. 3 prepared or maintained by Conrail and provided or available to Defendants. In their initial response, Defendants stated that "Conrail did not make its data regarding service and transit times for the 'defined' routes available to defendants." Plaintiff's Exhibit E at 4. On its motion to compel, Plaintiff contended that such information was available to Defendants because Defendants had access to the information to enable them to develop "an operating plan and train schedules for submission to the STB [Surface Transportation Board]". Plaintiff's Memorandum at 8, 13–14. Defendants also acknowledged the probable existence of such schedules. Plaintiff's Exhibit E at 4 ("Conrail train schedules ... may still exist."); Plaintiff's Exhibit H (Norfolk Southern 1998 Annual Report at 10 (Defendants') "team" received Conrail's train schedules to facilitate "coordinating" of Defendants' and Conrail's schedules and "block definitions"). Additionally, as Defendants' management "worked hand-in-hand all the way," *id.* at 12, with Conrail's management to assure a successful merger of the two major railroads as to the Conrail routes and assets to be acquired by Defendants, *i.e.,* those owned and operated by Conrail's wholly owned subsidiary Pennsylvania Line LLC, which includes the Defined Routes it is difficult to believe such collaboration and coordination of schedules did not include (if not require) Defendants' access to relevant Conrail operational records.

The court also found that Defendants' response, *i.e.*, that Conrail did not make relevant data available to Defendants, strongly implied Defendants were aware that the data existed in Conrail's possession but such data had not been turned over to Defendants. Amended D & O at 21. Defendants further also asserted, in opposition to Plaintiff's motion to compel, that trip plans may be "overwritten." As the acquiring company of Conrail's rail lines and related assets, including the relevant Conrail records that had been used by Defendants to effectuate and carry out, under governmental oversight, the acquisition of Conrail assets, the court found such documents responsive to Request No. 4 were in Defendants' control and should be provided to Plaintiff. *Id.*

In support of reconsideration, Defendants stated that "aggregated not route specific information" relating to Conrail records responsive to this request were obtained by Defendants in the form of Surface Transportation Board and Conrail Transaction Council reports. Heilig Affidavit II, ¶ 4. Defendant also acknowledged receiving Conrail trip plans and that Defendants did not obtain service or transit times for the Defined Routes. *Id.* However, as with Defendants' earlier responses, Defendants do not deny responsive documents exist in Conrail's possession. Further, while Defendants, in their objections and motion, discuss trip plans, as well as service and transit times, the court notes that such document types are not among the types of service related documents sought by Request No. 4. Thus, Defendants have never satisfactorily and fully responded to the particular requests made by Plaintiff in Request No. 4, and as such have waived any further objection to production of the specific records requested. Also, while Defendants rely on Ms. Butler's affidavit, Supplemental Response at 4, no discussion of Request No. 4 is found within the body of the Butler Affidavit. Finally, to the extent Defendants intended to assert that responsive documents may be within Conrail's possession, but are not subject to Defendants' control for Rule 34(a) purposes, the court has, for the reasons discussed, Discussion, *supra*, at 459–60, rejected this contention. Accordingly, the court finds it has not overlooked any facts available to it, nor will rejection of Defendants' request for reconsideration on Plaintiff's Request No. 4 operate to cause manifest injustice to Defendants. Defendants' motion for reconsideration as to Plaintiff's Request No. 4 is therefore DENIED.

*Plaintiff's Request No. 5.*

Plaintiff's Request No. 5 sought car movement records for Defendants' salt shipments over the Defined Routes for similar cargo shipped by Defendants' competitors Akzo Nobel and Cargill. Defendants' response included generalized objections, and a statement that a complete response required Plaintiff supply more detailed information including "car numbers" with which to enable Defendants to identify car movement records within Plaintiff's request. Defendants also reiterated that any responsive documents were not received from Conrail. Finding that Defendants' assertions were negated by Ms. Butler's deposition testimony regarding Defendants' retention of the underlying relevant data in Defendants' computer system, responsive to this request, and the fact that relevant car movement records can be ascertained through other records available to Defendants, the court rejected Defendants' objection to this request. Amended D & O at 21–22.

In support of reconsideration, Defendants acknowledged that Defendants did obtain some responsive records from Conrail, however, Defendants reasserted the need for more detailed information regarding freight car identification to enable Defendants to produce responsive documents and relied on Heilig Affidavit II and the Butler Affidavit. Defendants' Supplemental Response at 4. However, Mr. Heilig's affidavit merely reiterates Defendants' asserted need for more detailed information; it makes no effort to rebut Plaintiff's contention that the requested records are in fact available, as Ms. Butler testified in her deposition, in Defendants' computer record and data keeping systems, and that responsive records can also be gleaned by reference to or use of consignor designations on the car movement records that are available to Defendants and within the scope of Request No. 5. Moreover, noth-

ing in Ms. Butler's affidavit directly addresses the question of Defendants' asserted need for more detailed information as in her affidavit Ms. Butler narrowly claims that Defendants lack documents "specifically" responsive to Request No. 5 and that the Request seeks unavailable Conrail records. However, it is Plaintiff's Request No. 6, not No. 5 that seeks Conrail records.[17] As such, neither Heilig's nor Butler's affidavit complies with the court's direction that Defendants provide affidavits of knowledgeable officials to support Defendants' asserted inability to provide the requested documents. Amended D & O at 22. Accordingly, the court did not overlook available information in adjudicating Plaintiff's motion, and manifest injustice will not result from the court's rejection of Defendants' request for reconsideration of the Amended Decision and Order in regard to Plaintiff's Request No. 5. Defendants' motion for reconsideration as to Plaintiff's Request No. 5 is therefore DENIED.

*Plaintiff's Request No. 6.*

This request seeks Conrail documents identical to those described in Request No. 5 that Defendants received from Conrail or are available to them. The court rejected Defendants' objection that the records were not available. Amended D & O at 22. In their Supplemental Responses, Defendants reassert such Conrail documents are not available to them, and again rely on the Heilig and Martin affidavits. For reasons fully discussed rejecting Defendants' motion as to Plaintiff's Request No. 2, Discussion, *supra*, at 454–61, Defendants' contentions supporting reconsideration as to Request No. 6 are also rejected, and Defendants' motion for reconsideration as to Request No. 6 is DENIED.

*Plaintiff's Request No. 7.*

In this request, Plaintiff sought documents relating to standards and goals, planned transit times, service standards, trip plans, car trip plans, car scheduling (data) plans or rules, train blocking plans, service planning documents, or car or train scheduling di-

rectives for the Defined Routes from January 1, 1998 to present. Plaintiff's Exhibit E at 5. Defendants initially objected on vagueness, overbreadth, redundancy (by comparison of Request Plaintiff's No. 7 to Plaintiff's Request No. 1), burdensomeness, relevancy and the lack of specificity.

Defendants did not specifically respond to Plaintiff's motion to compel as to Request No. 7. In support of its motion to compel, Plaintiff noted that Ms. Butler testified at her deposition that Defendants' records, including transit times for the Defined Routes, were available to Defendants as of June 1999. Plaintiff's Memorandum at 15 (citing Plaintiff's Exhibit M at 30–31). The court overruled each of Defendants' objections and directed Defendants to produce all documents responsive to Request No. 7. Amended D & O at 23.

In support of reconsideration, Defendants rely on their Supplemental Responses to Request No. 1 which states that Defendants do not maintain or possess "in the ordinary course of their business," any responsive documents for the period June 1, 1999 to September 1, 2000, and that Defendants are unaware whether responsive documents for the period September 1, 1998 to May 31, 1999 are available as the Defined Routes were operated by Conrail during such period. Defendants' Supplemental Responses at 2. However, Defendants acknowledged the availability of responsive documents containing "aggregated" information. *Id.* at 2–3. Defendants also relied on Mr. Heilig's affidavit in which Heilig averred that Defendants possess no documents "specifically responsive to ... Request No. 1 and 7." Heilig Affidavit I, ¶ 3.

First, the court notes that a careful reading of Request No. 7 indicates that only three categories of documents sought by the Request—trip plans, scheduling plans ("data") or rules, and "train scheduling directives"—appear to duplicate the actual types of documents sought by Plaintiff's Request No. 1. Second, Heilig's averment that

---

17. That Ms. Butler felt obliged to tailor her response to "specifically" responsive documents fairly implies that "generally" responsive documents likely exist, but have been withheld by Defendants because of Defendants' opinion that such "general" records are not "specifically" responsive.

Defendants lack documents "specifically responsive" to the request implies, as with Butler's affidavit regarding Plaintiff's Request No. 5, that Defendants in fact have documents generally within the scope of the Request, but refuse to provide them because, in Defendants' judgment, the documents are not "specifically responsive." Discussion, *supra*, at 463–64. For example, Defendants acknowledged the existence of relevant records in "aggregated form" yet failed to produce such "aggregated" documents despite the fact that such records are within the scope of Plaintiff's request. The court therefore held such unilateral limitation on the scope of a document production request to be impermissible under Rule 34(a). Amended D & O at 12–13. The court also overruled Defendants' generalized objections asserting vagueness, overbreadth and burdensomeness. Amended D & O at 23.

As to Defendants' motion, the court finds that Heilig's affidavit, Heilig Affidavit I, fails to rebut Ms. Butler's deposition testimony that one key category of relevant documents, *i.e.*, transit time for the Defined Routes, as requested by Plaintiff, has existed since 1999. Significantly, Ms. Butler's March 2003 affidavit makes no attempt to modify her deposition testimony or reconcile it with Mr. Heilig's broad averment, Heilig Affidavit I, ¶ 2, that *none* of the responsive records are or were available to Defendants when Ms. Butler testified at her deposition. *See* Butler Affidavit, *passim*. Nor does the Heilig affidavit, Heilig Affidavit I, ¶ 2, attempt to rebut Plaintiff's contention that Defendants created a "Thoroughbred Operating Plan" which improved customer service on Defendant Norfolk Southern Railway's lines, including the Defined Routes, in 2001. Plaintiff's Memorandum at 10 (citing Plaintiff's Exhibit L at 6.) [18] This plan which, according to Defendants "began with a study of way bills," yielded "an accurate data base of traffic variation." Plaintiff's Exhibit L at 6. To now suggest, based solely upon generalized denials, that Defendants lack documents, including Defendants' Thoroughbred Operating Plan, responsive to Plaintiff's Request Nos. 1 and 7 (particularly when no such basis for refusing to respond to the Request was included in the Defendants' initial objections served in September 2002) is patently inconsistent, and thus lacking in credibility. Accordingly, the court rejects Defendants' request for court's determination of the Amended Decision and Order as to Plaintiff's Request No. 7, finding that requiring Defendants' response will cause no manifest injustice for Defendants. Defendants' motion for reconsideration as to Plaintiff's Request No. 7 is therefore DENIED.

*Plaintiff's Request No. 8.*

This request seeks transportation contracts or agreements between Defendants and Conrail and Akzo Nobel and Cargill. Defendants interposed generalized objections including that the agreements were confidential and that Defendants lacked authority to produce them pursuant to Plaintiff's request. In its Amended Decision and Order, the court overruled Defendants' objections. Amended D & O at 23–24. The court found Defendants failed to provide support for its claims that production would impair any proprietary information entitled to protection under Fed.R.Civ.P. 26(c), including relevant portions of the agreements.

In support of reconsideration, Defendants contend that because Defendants are unable to disregard their asserted confidentiality obligations under the agreements, it is Plaintiff's obligation to obtain such consent to production from Akzo Nobel and Cargill. Defendants' Supplemental Response at 5–6. Defendants also argue the information in the agreements lack relevance to Plaintiff's claims in that Akzo Nobel's and Cargill's shipments did not necessarily use exactly the same routes as some of Plaintiff's shipments had different destinations than those for Akzo Nobel's or Cargill's shipments. *Id.* at 6. Defendants additionally maintain that Defendants lack access to similar agreements in Conrail's possession for the period prior to June 1997. *Id.* at 6. In further support of

---

**18.** Nothing in Defendants' 2001 Annual Report's discussion relating to development of the Thoroughbred Operating Plan suggests it excluded information of service improvements for the Defined Routes. Such exclusion, if made, would have probably rendered the Annual Report materially inaccurate and incomplete.

Defendants' motion, Defendants submitted an affidavit of Robert T. Plain, a marketing director for Defendant Norfolk Southern Railway Company, in which Mr. Plain makes averments asserting the confidential nature of the agreements. Plain Affidavit ¶ ¶ 4, 6. However, Mr. Plain's affidavit fails to include the text of the confidentiality provision Defendants claim obligates them to refuse to respond to a valid discovery request in a federal civil action.

■ It is basic that a party is obligated to respond to document requests pursuant to Fed.R.Civ.P. 34(a) that are within the scope of Fed.R.Civ.P. 26(b), *i.e.*, any matter not privileged and relevant to the claim or defense. Fed.R.Civ.P. 34(a). Further, to avoid annoyance, embarrassment, oppression or undue burden or expense the court, for good cause shown, may order that "commercial information not be revealed." Fed. R.Civ.P. 26(c). However, in general a motion for a protective order pursuant to Rule 26(c) "must be brought by the individual whose interests are affected … [and] a party may not move for a protective order to protect the interests of another, but may move to protect the party's own interests when discovery is sought from another." Baicker–McKee, Janseen, Corr, FEDERAL CIVIL RULES HANDBOOK, *supra,* at 607. Moreover, Defendants do not represent that either Akzo Nobel or Cargill object to the requested production. Absent a showing that either Akzo Nobel or Cargill have stated they object to Plaintiff's request for the agreements, Defendants are without standing to assert the alleged confidentiality or non-disclosure provision as a ground for refusing production. 8A WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE, CIVIL (2d ed. 2004) § 2035 ("A party may not ask for a [protective] order to protect the rights of another party … if that party does not claim protection for [it]self.") (citing cases).

Here, the court has found that the agreements are relevant within the definition of Rule 26(b), and Defendants have not demonstrated that each and every part of the agreements sought by Plaintiff are confidential under the factors used by courts to determine such questions. *See Four Star Capital Corporation v. Nynex Corp.,* 183 F.R.D.

91, 110 (S.D.N.Y.1997). Defendants' contention that the request is irrelevant because of the alleged lack of complete congruity of all rail routes used to haul salt shipments by Plaintiff, Akzo Nobel and Cargill is unavailing because Akzo Nobel used identical routes, Plaintiff's Reply at 3, and the agreements may contain guaranteed transit times for identical "legs" of the routes used. *Id.* Defendants have not demonstrated otherwise.

■ Nor have Defendants at any time moved for a protective order or otherwise established, as is their burden, *Loussier v. Universal Music Group, Inc.,* 214 F.R.D. 174, 177 (S.D.N.Y.2003), that they would suffer annoyance, embarrassment, oppression, or undue burden, if required to produce the agreements. For example, Defendants fail to establish by reference to a specific provision in the agreements that the documents are to be treated as confidential, and can not be disclosed in whole or part responsive to a litigation discovery request or court order. Moreover, Mr. Plain's affidavit does not explain how the asserted confidentiality clauses are enforceable. Any failure to include in the agreements an obligation by either party to seek a protective order when served with a discovery request or even to advise the other party of such service so that the other party may seek judicial intervention, is not an excuse for refusal to comply with an otherwise valid Rule 34(a) request. *See* Fed. R.Civ.P. 37(d) (the failure to produce documents pursuant to Rule 34(a) "may not be excused on the ground that the discovery sought is objectionable unless the party failing to act has a pending motion for a protective order as provided by Rule 26(c))." Nor do Defendants represent they are subject to any penalty for compliance with a valid discovery request, or that such risk outweighs the probative value of the agreements to establishing Plaintiff's claims. *See Rivera v. NIBCO, Inc.,* 204 F.R.D. 647, 649 (E.D.Cal. 2001) ("the court may balance the interests in allowing discovery against the relative burdens to the parties").

Here, Defendants admit the Akzo Nobel and Cargill contracts contain special provisions not extended to Plaintiff during the

relevant period for their shipments over the Defined Routes. Plain Affidavit ¶ 4. As Plaintiff points out, and Defendants do not deny, such provisions may include transit time, and freight car cycle or turn time, guarantees better than the actual transit times and turn times achieved by Defendants for Plaintiff's shipments, and freight cars, thus negating any defense that the higher transit times for Plaintiff's shipments, arguably constituting unreasonable dispatch, result from circumstances beyond Defendants' control. Revealing such guarantees, and even Defendants' freight shipment prices to Akzo Nobel and Cargill, nearly six years after the transactions to which the agreements relate, would be to maintain the secrecy of stale commercial information, without any showing that such disclosures is likely to have any material adverse competitive effects upon either Defendants or Akzo Nobel or Cargill, while depriving Plaintiff of its right to full discovery and a fair determination of the merits of this action.

Therefore, the court finds Defendants' interest in refusing production of the agreements upon the grounds submitted in support of Defendants' motion for reconsideration, is outweighed by Plaintiff's need for access to the requested documents. Accordingly, the court has not failed to consider information available to it when deciding Plaintiff's motion as to Request No. 8, and that no manifest injustice will result from adhering to its decision in the Amended Decision and Order overruling Defendants' objections to Request No. 8. Further, as discussed, Discussion, *supra*, at 460–61, in regard to Defendants' claim in opposition to Plaintiff's Request No. 2, that Defendants lacks control over responsive documents in the possession of Conrail, Defendants' motion for reconsideration as to Plaintiff's Request No. 8 on this ground is similarly without merit; therefore, Defendants' motion for reconsideration as to Plaintiff's Request No. 8 is DENIED.

*Plaintiff's Request No. 9.*

In this request, Plaintiff seeks records, minutes or notes of meetings between Defendants, and Conrail, and Akzo Nobel or Cargill involving shipments of Akzo Nobel or Cargill commercial salt between the origin and destination points as described in the Defined Routes. Defendants initially objected on generalized grounds, however, in support of its motion to compel, Plaintiff also asserted that the request covered "the same or similar routes." Plaintiff's Memorandum at 16. Plaintiff also rebutted Defendants' relevancy objection noting that the requested documents could reveal admissions by Defendants that transit times achieved by Defendants for Akzo Nobel's or Cargill's salt were also delayed, as Plaintiff alleges regarding its own shipments, and thus failed to meet the reasonable dispatch requirement. Plaintiff's Memorandum at 16. In opposition to Plaintiff's motion, Defendants asserted their general relevancy objections and further objected to Plaintiff's attempt to enlarge the scope of the request by arguing it also covered "similar" routes. Defendants' Memorandum at 10. In the Amended Decision and Order, the court overruled Defendants' general objections but limited the request to the Defined Routes only. Amended D & O at 24–25.

In support of reconsideration, Defendants reiterate their argument for reconsideration submitted in their initial opposition to Request No. 8, requesting agreements between Defendants and Conrail and Akzo Nobel and Cargill. Defendants' Supplemental Response at 6–7. Based on the court's rejection of Defendants' contention in support of reconsideration of the court's disposition of Defendants' objections to Request No. 8, Discussion, *supra*, at 465–67, Defendants' request for reconsideration of the disposition of Defendants' objection as to Request No. 9 on this ground is also rejected, and therefore DENIED.

Defendants do not seek reconsideration of the court's determination of Defendants' contention that the requested documents for transit times and service problems reflecting reduced transit times on the Defined Routes was unnecessary because Plaintiff's expert may have access to at least some of the data sought from Defendants. Amended D & O at 25–26.

In sum, the court finds that Plaintiff's document Requests Nos. 1—9, and Interrogatory No. 1 seek relevant information, that Defendants' objections as to vagueness, overbreadth or burdensomeness are invalid, that Defendants' Supplemental Responses and affidavits in support of reconsideration do not warrant the requested relief, and that such Supplemental Responses and affidavits are, in many instances, either intentionally or unintentionally evasive or misleading, or inconsistent with Defendants' earlier responses, and otherwise without merit.

## CONCLUSION

Based on the foregoing, Defendants' motion for reconsideration is DENIED. Defendants shall produce to Plaintiff all responsive documents to Plaintiff's Request Nos. 1—9, and serve an answer, or data from which Plaintiff may determine an answer, to Plaintiff's Interrogatory No. 1 *not later than 30 days* following service of this Decision and Order.

SO ORDERED.